**Walter Wesley ELLEBRACHT, Appellant,**

v.

**Margaret A. ELLEBRACHT, Appellee.**

**No. 3-86-057-CV.**

Court of Appeals of Texas, Austin.

Aug. 12, 1987.

Clinard J. Hanby, Houston, for appellant.

Terry Weeks, Darrell D. Gest, Austin, for appellee.

Before SHANNON, C.J., and BRADY and ABOUSSIE, JJ.

ABOUSSIE, Justice.

After a non-jury trial, Margaret A. Ellebracht was granted a divorce from Walter Wesley Ellebracht on May 12, 1986. The parties' property was divided by the trial court in the divorce decree. Mr. Ellebracht brings this appeal solely to challenge the trial court's characterization of the parties' ranch as community property. We will affirm the judgment.

The parties were married in 1952. In 1961, Mr. Ellebracht's mother, Leona Ellebracht, conveyed the western one-half of her ranch, approximately 1,300 acres, to her son. The deed was to "Wesley Ellebracht" as grantee, but there were no significant recitals limiting the conveyance to him as separate property. The deed recited consideration of "$10.00 ... and the further sum of Thirty Thousand and no/100 Dollars ($30,000.00) in the assumption and promise to pay" the balance owing on a debt secured by the property. The deed did not recite from whose estate the debt was to be paid. At the time of the transfer, the ranch was valued between $84,500 and $96,220.

Findings of facts and conclusions of law were filed by the trial court. The pertinent findings are as follows:

*Findings of Facts*

\*  \*  \*  \*  \*  \*

8.  As consideration for the foregoing conveyance, the parties agreed to assume the remaining $30,000 in-

debtedness on said ranch, agreed to assume two unsecured notes for $10,000, agreed to manage both halves of the Ellebracht Ranch, and agreed to pay Leona Ellebracht rent for occupancy of the ranch house.

9. The February 23, 1961 conveyance by Leona Ellebracht of the western half of the Ellebracht Ranch was a sale.

10. Respondent did not show by a preponderance of the evidence that Leona Ellebracht had a donative intent in the conveyance of the western half of the Ellebracht Ranch on February 23, 1961.

11. The February 23, 1961 conveyance by Leona Ellebracht of the western half of the Ellebracht Ranch was not a gift.

Neither party contests the fact that the parties assumed and paid the $30,000 note as consideration for the transfer. Appellant claims the remaining findings set out above are supported by either no evidence or insufficient evidence, or are against the great weight and preponderance of the evidence.

Based upon its findings, the trial court concluded that the 1300 acre ranch became community property on the date conveyed, which conclusion appellant also claims was error.

Community property consists of all property acquired during marriage, other than separate property. Tex.Fam.Code Ann. § 5.01(b) (1975). A spouse's separate property includes any real property acquired during marriage by gift. Tex. Const.Ann. art. XVI, § 15 (Supp.1987); Tex.Fam.Code Ann. § 5.01(a)(2) (1975). All property acquired during marriage by either party is presumed to be community. *Tarver v. Tarver*, 394 S.W.2d 780 (Tex.1965). Likewise, all property possessed during or on dissolution of the marriage is presumed to be community. Tex.Fam.Code Ann. § 5.02 (1975). The presumption is rebuttable, but the burden is on the spouse claiming otherwise to prove the contrary. *McKinley v. McKinley*, 496 S.W.2d 540 (Tex.1973); *Tarver, supra.* Any doubt as to the character

of property should be resolved in favor of the community estate. *Akin v. Akin*, 649 S.W.2d 700 (Tex.App.1983, writ ref'd n.r.e.); *Contreras v. Contreras*, 590 S.W.2d 218 (Tex.Civ.App.1979, no writ). If Leona Ellebracht gave the ranch to her son as a gift, however, the ranch would be Mr. Ellebracht's separate property.

A gift has been defined as a transfer of property made voluntarily and gratuitously, without consideration. *Hilley v. Hilley*, 342 S.W.2d 565 (Tex.1961). The burden of proving a gift of real property is on the party claiming the gift was made. *Woodworth v. Cortez*, 660 S.W.2d 561 (Tex.App. 1983, writ ref'd n.r.e.). One controlling factor is the donative intent of the grantor at the time of the conveyance. *Alexander v. Bowens*, 595 S.W.2d 176 (Tex.Civ.App. 1980, no writ).

It has been held that a conveyance from a parent to a child can give rise to a presumption of gift. *Woodworth v. Cortez, supra.* At the same time, however, exchange of consideration precludes a gift. *Williams v. McKnight*, 402 S.W.2d 505 (Tex.1966). " 'Gift' and 'onerous consideration' are exact antitheses. The idea of their existence involves a paradox." *Kearse v. Kearse*, 276 S.W. 690, 693 (Tex. 1925). A recital of onerous consideration in a deed "negatives the idea of a gift." *Kitchens v. Kitchens*, 372 S.W.2d 249, 255 (Tex.Civ.App.1963, writ dism'd).

The court of appeals held in *Kiel v. Brinkman*, 668 S.W.2d 926 (Tex.App.1984, no writ), that a conveyance from parents to their son was a gift, despite an $1800 loan on the property paid by the son. In *Kiel*, however, the son did not extinguish the parents' debt under an obligation to do so. There was no showing that the conveyance was made *in exchange for* the payment of the debt. A fact question existed, therefore, whether the transfer was a gift or a sale, which was decided by the jury in favor of a gift. Unlike *Kiel*, the deed to Mr. Ellebracht recited that the grantee *assumed* and *agreed to pay* the $30,000 note *as consideration* for the transfer. If any

fact issue existed, it was decided by the judge in favor of a sale and not a gift.

Aside from the deed itself, the evidence bearing upon this appeal consists of the testimony of Margaret Ellebracht, Walter Ellebracht and his mother, Leona Ellebracht. Some of the witnesses responses are at best argumentative, evasive and sometimes contradictory.

Both Walter Ellebracht and Leona Ellebracht claimed to be uncertain about the transaction. At one point Mr. Ellebracht responded as follows:

Q. Are you saying to us that we need to ask Margaret now, what you-all paid for that ranch?

A. That would be a whole lot better because she probably was a more expertise [sic] at it than I am.

Margaret Ellebracht's testimony relating to the ranch transfer was as follows:

Q. Do you recall the promises of the deal that was made when this ranch was deeded to Wesley in 1961?

A. We assumed the note that was on the ranch and agreed to pay it.

Q. And how big a note was that?

A. It was $30,000.00.

Q. Did you all take over any other unsecured notes?

A. Yes. There were two notes of about $10,000.00 each that we assumed for the livestock.

\* \* \* \* \* \*

Q. Were there any agreements that you recall back in 1961?

A. Well, we took care of her livestock up until we bought it in 1961 by assuming the note.

On cross examination, Margaret Ellebracht stated as follows:

Q. Ms. Ellebracht, you testified that in 1961 when Leona Ellebracht deeded the ranch to Wesley, you-all assumed a $30,000.00 note.

A. Yes.

Q. And you also said that you-all assumed some unsecured notes but that those notes were for livestock; is that correct?

A. Yes.

Q. And did you give or pay Ms. Ellebracht, Sr., Ms. Leona Ellebracht, anything of value, other than assuming the note in connection with the ranch?

A. Not that I recall.

With respect to the conveyance of the ranch to him, Walter Ellebracht testified as follows:

Q. Now, let's move along to the actual acquisition of the ranch.... When you bought it from your mother. Do you remember that?

A. Oh, yes, sir.

Q. And do you remember you had a contract with your mother to buy it?

A. To buy, yes, sir.

\* \* \* \* \* \*

Q. So in 1961, you acquired—you got the ranch via the deed and you agreed at that time to pay the $30,-000 in debt that was owed on the property, and you agreed, furthermore, that you had leased your mother's house from her, right?

A. I assume that's right. That's my vague understanding of it.

Q. And the other thing you were going to do was, you were going to take care of your mother's cattle for her, right?

A. Sir, I don't know whether you understand it, but it is customary that you take care of your mother and your mother's interest....

\* \* \* \* \* \*

Q. The understanding was that you would take care of your mother's cattle, also, wasn't it?

A. The understanding was that I took care of my mother's interest ever since I was six years old.

Q. All right. And you were going to continue to do it—

A. As long as I live, yes, sir.

Q. And she was going to give you a deed to that ranch?

A. I do not know whether one had anything to do with the other or not.

Q. You just know that you're supposed to pay the 30,000?

A. I know I was supposed to pay the 30,000 ... and exactly what I was supposed to do for my mother, whether that come under just what is expected of a son ... and what is the legal deal, I have no idea of separating one from the other.

Q. The other thing you agreed to do at the time of the purchase of the ranch, was to pay off your mother in cattle, wasn't it?

A. Sir, I imagine that those would have had to be paid if she wanted to keep the cattle.

Q. They had to be paid, and you were the one who was going to have to do it, weren't you?

A. Yes, sir.

\* \* \* \* \* \*

Q. Mr. Ellebracht, your mother had a couple of notes, each for $10,000, as I recall, that she owed on her cattle; is that correct?

A. I do not work in the office.

Q. I understand, but when you start throwing $10,000 notes around ... you noticed that you had a big debt that you've got.

A. I had an awful big debt, and I had to work like hell, yes, sir.

Q. And part of it was on your mother's cattle, right?

A. I assume so.

Mrs. Leona Ellebracht testified as follows concerning the transaction:

Q. Now, Mrs. Ellebracht, why was it that you deeded this property to Wesley?

A. Well, I thought that he needed some land too. I had so much land and he had none.

Q. Is there any other reason?

A. And he was my only child and I figured that he could make a living for a family better with land than without. I don't know what to say.

Q. Did Wesley pay you any money for the ranch?

A. No, ma'am.

Q. Did you and Wesley have any other agreements about the ranch? Did he agree to do anything for you if you would deed the ranch to him?

A. No, ma'am. I just naturally thought that they would treat me as a mother.

Q. But did you ask them to promise anything before you deeded the ranch to him, or did you ask Margaret to promise anything?

A. No ma'am.

Q. Did you insist that he assume that debt?

A. It was so long ago I don't remember, but I imagine he did or he wouldn't have done it. I imagine that, now. I don't remember it.

\* \* \* \* \* \*

Q. Would you have demanded that he return the ranch to you had he not paid it?

A. No, ma'am, but I sure would have raised hell if he didn't pay it. I imagine he paid it to get me out of his hair.

Q. .... When you deeded the ranch to Wesley; ... didn't Margaret and Wesley promise to pay you some rent while they lived in your nice ranch house? Didn't they promise to take care of your stock?

A. Oh, yes, I remember them taking care of stock. I don't remember them promising me money, but I won't say they didn't.

\* \* \* \* \* \*

Q. He [Wesley] said there was a deal.

A. Well, there could have been, I'm not going to say. He was younger than I was.

Q. He said basically it wasn't written down—

A. It wasn't.

Q. —but that there was some understanding that you were going to deed this ranch to him and he was going to take care of your livestock and pay off that mortgage?

A. Well now, is that what you meant? I thought you meant money.

Q. Well, pay off the mortgage would take some money, of course, but maybe he was just going to take care of your livestock instead of paying you rent on the house. Isn't that your understanding of what happened back then? ...

Q. And I'm thinking Wesley probably told you that he and Margaret would repay you?

A. They might have, they might have just let me take it for granted they would.

Q. Wesley tells us in December, two months ago, that that was the deal. Are you saying that you don't remember? Does that sound like the deal to you?

A. It sounds like the deal....

In considering a "no evidence" point, the reviewing court must reject all evidence contrary to the jury's findings and consider only the facts and circumstances which tend to support those findings. *Renfro Drug Co. v. Lewis*, 149 Tex. 507, 235 S.W.2d 609 (1950). In reviewing factual sufficiency points of error, the reviewing court considers all of the evidence to determine whether the findings are so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate*, 244 S.W.2d 660 (Tex.1951).

The trial court's findings of fact have the same force and dignity as a jury verdict. If supported by some competent evidence, they will not be disturbed on appeal unless they are so against the overwhelming weight of the evidence as to be clearly and manifestly wrong. *Nelson v. Jordan*, 663 S.W.2d 82, 86 (Tex.App.1983, writ ref'd n.r. e.); *Skinny's, Inc. v. Hicks Bros. Const. Co.*, 602 S.W.2d 85, 88 (Tex.Civ.App.1980, no writ); *Greater Beauxart Garden Municipal Utility District v. Cormier*, 596 S.W.2d 597, 600 (Tex.Civ.App.1980, no writ). A court of appeals may not pass upon the credibility of the witnesses or substitute its findings for those made by the trial judge, nor may it substitute its judgment for that of the trier of fact, whether it may have reached a different conclusion after reviewing the evidence. *In the Interest of J.J.R.*, 669 S.W.2d 840 (Tex.App.1984, writ dism'd); *Ryan v. Morgan Spear Associates, Inc.*, 546 S.W.2d 678, 685 (Tex.Civ.App.1977, writ ref'd n.r. e.). The trial court is free to observe the witnesses, hear their testimony, determine their credibility and weigh the evidence.

Examining only the evidence in the record in support of the facts found by the trial judge and ignoring all contrary evidence, we hold there is some probative evidence to support each of the trial court's findings and each fact can be reasonably inferred from the evidence. A review of the entire record for all evidence bearing on these fact issues, we hold, reveals sufficient evidence to support each fact found, and no finding which is challenged is against the weight and preponderance of the evidence or manifestly unjust.

A careful review of all three witnesses' accounts reveals that all the livestock, with the exception of a few head, at all times was owned by Leona Ellebracht. There was nothing to indicate the parties purchased Leona's livestock from her. In her testimony, Leona affirmatively claimed ownership of all livestock, and Walter testified the parties paid off the two notes so that his mother could keep her livestock. In other words, the parties paid $20,000, but Leona retained the livestock. The trial court reasonably could infer from all the testimony that assumption of this debt was additional consideration for the land transaction, and that the parties "paid off" his mother in cattle, which neither Walter nor Leona denied.

Neither Walter nor Leona testified the transaction was intended by Leona to be a gift when the property was deeded. Leona merely stated that she deeded the ranch to her son because she wanted him to have some land, not that she wanted to give land to him. Mr. Ellebracht admitted that he had an agreement with his mother to buy the land from her. Neither ever denied the transaction was a sale. Indeed, there is no direct evidence to overcome the presumption that the ranch was community

property. But for the relationship of mother and son and the implication that the transfer was for less than adequate consideration, there is no evidence indicating a gift or donative intent.

While evidence concerning whether the parties agreed to pay house rent and manage the ranch by caring for the cattle as consideration is slight, these facts are not dispositive of the case, and we would reach the same result even were these facts not proven. The trial court was free to resolve any conflicts in the testimony.

If there is any evidence of probative value to support the findings, the appellate court should affirm. *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965). We hold there is competent evidence as to each fact established, and that these facts support the trial court's legal conclusion that the 1300-acre ranch constituted a part of the parties' community estate.

Finally, should a judgment rest upon more than one ground, the party aggrieved by the judgment must assign error as to each such ground or risk having the judgment affirmed on the ground to which no error was assigned. *Midway National Bank of Grand Prairie, Texas v. West Texas Wholesale Supply Co.*, 453 S.W.2d 460 (Tex.1970); *McKelvy v. Barber*, 381 S.W.2d 59 (Tex.1964).

The court's finding that the parties assumed and agreed to pay a $30,000 debt on the ranch as consideration for the transfer stands unchallenged. The deed specifically states that Leona Ellebracht conveyed the property in consideration for the grantee's promise to assume and to pay a $30,000 note, a significant sum. This fact alone, in light of all the evidence, is factually sufficient to support the court's finding that the transaction was a sale rather than a gift and, therefore, fully supports the conclusion that the ranch was community property. Appellant does not suggest that the conveyance may have been partly both a gift and a sale, and we do not address this question.

A finding that $30,000 even when compared to the value of the property conveyed, constituted onerous consideration would not be manifestly unjust. This fact alone precludes this transfer from being a gift, and when coupled with the assumption of two additional notes totalling $20,000, we hold there is more than sufficient evidence to support the court's findings. Appellant's points of error are overruled and the trial court's judgment affirmed.