In The



Court of Appeals



Ninth District of Texas at Beaumont


____________________



NO. 09-06-301 CV


____________________



DEBORAH KAY BURGESS, Appellant



V.



MAX LINDLEY BURGESS, Appellee






On Appeal from the County Court at Law No. 3


Montgomery County, Texas


Trial Cause No. 05-01-00168-CV






MEMORANDUM OPINION


 Appellant Deborah Kay Burgess appeals from the trial court's property
characterization and division in her divorce decree, as well as the granting of the divorce on
the ground of cruelty. We affirm in part and reverse and remand in part.

Background


 Deborah and appellee Max Lindley Burgess were married on April 6, 1991. No
children were born or adopted during the marriage. In January of 2005, Max filed for
divorce. Max cited as grounds for divorce both cruelty and insupportability due to discord
or conflict of personalities.

 At the bench trial, Max testified that he owned a home in Harris County before he
married Deborah. Max still owed $4700 on the mortgage when he and Deborah married, and
he paid the $4700 in monthly installments of $57 using funds from his paycheck. (1) While
Max and Deborah were living in the Harris County home, the home flooded, and Max
received $56,000 from his flood insurance company. When Max subsequently sold the
Harris County home, he received $81,602, which he then paid toward the purchase of a new
home in Willis. Max testified that he also applied $36,000 of the flood insurance settlement
toward the purchase of the Willis home. In addition, Max borrowed $18,000 from his 401(k)
plan to purchase the lot for the Willis home. Max testified that he built a $21,900 detached
garage at the marital residence using a $15,000 loan from his mother. According to Max, he
also received $48,000 as a gift from his mother, and he used that money for the Willis house
and its garage. Max testified that although the $48,000 was a gift, he made a few payments
to his mother for the money. However, during cross-examination, Max characterized the
$48,000 as a loan, and he explained that his mother subsequently forgave the debt. Max
testified that he advanced a total of $142,458 of his separate funds toward the construction
of the Willis house.

 Max testified that the marriage had become insupportable because of discord or
conflicts of personalities, reconciliation was impossible, and Deborah had been cruel to him. 
Max opined that he should receive the house because of Deborah's cruelty to him. 
According to Max, the marriage was only enjoyable for three to four years, and he testified
that Deborah "quit being a wife to me." Max explained that Deborah did not sleep in the
bedroom with him because she had to stay up late to check on her daughter Heather, who
worked "at the bars and she didn't get off 'til 2:00 or 3:00 in the morning. She talked to
Heather all the way home so she wouldn't fall asleep." Max testified that he and Deborah
had not been sexually intimate for eight to nine years, and although this was a problem for
him, she refused to attend counseling.

 After Max married Deborah, he learned she had credit card debt that she was unable
to pay. However, Deborah did not tell him how much she owed. Max testified that Deborah
sought assistance from Consumer Credit Counseling Services ("CCCS"), and Max
contributed $20,000 from his pre-marriage savings toward her debt reduction program. Max
and Deborah also filed a petition for bankruptcy, and that proceeding concluded on February
12, 2004.

 Max testified that he "barely made it through school" because he "couldn't read and
comprehend too good." Max explained that when he received his paychecks, he gave them
to Deborah, and "[s]he would sign my name to . . . my check and take it to the bank." Max
explained that he and Deborah usually deposited seven to eight hundred dollars from each
of his biweekly paychecks into the savings account. Max also testified that Deborah wrote
the deposits on the back of the checkbook when she went to the bank, but Max generally did
not see their bank statements despite asking Deborah for them. Max testified that he and
Deborah often fought when he saw the bank statements because "she had stuff that was done
wrong and she did not want me to see them." According to Max, his disagreements with
Deborah usually pertained to Deborah's credit card debt or to Heather. Max explained that
Deborah "was taking a lot of money from me to take care of Heather." Max testified, "I
would think it was going to get better after '95, the first time, credit cards. I loved her and
I cried about it, and I told her, her and Heather both, . . . 'Don't ever do this to me again.' 
She said, 'I won't.' It didn't last two or three years; it started again."

 In 2003, Max learned that Deborah was again having financial problems because he
began receiving phone calls from creditors, and he tried unsuccessfully to make a small
purchase using his debit card. Max explained that when he attempted to make the purchase,
he believed he had $53,500 in his savings account because Deborah had written that amount
on a card. When Max asked Deborah whether they had any money in the bank, she said,
"No." Max testified that Deborah "cooked the books the whole time we was married." Max
further explained that Deborah hid the mail before he got home, thereby preventing him from
seeing the bank statements. Max also testified that Deborah kept some of the bedrooms in
their home locked with a padlock and "a key that she hid. I couldn't even go into my
bedrooms. . . . She had stuff hidden in there."

 According to Max, Deborah withdrew $5,000 from his 401(k) plan without his
permission. Max also testified that he started an IRA in 1983 with $2,000, and the IRA is
presently worth only $1,000 because Deborah made withdrawals from it without his consent.
Max explained that he is sixty-two years old, and although he was eligible to retire at age
fifty-five, he did not do so because Deborah twice ruined his credit during their marriage, and
he had no money.

 Max testified that when Deborah left, she took his truck and his paycheck with her,
and he learned that their bank account only contained one hundred dollars. After Deborah
left, Max's mother loaned him money to purchase another truck, and he bought a 2002
Chevrolet Silverado. Max testified that he had been trying to convince Deborah to find a job
because, "[a]fter the bankruptcy, I was down to my last nickel. I had no money. My credit
was gone, all on account of her." According to Max, after Deborah left, she called him and
said "she'd lied to me for a long time, and she said she'd never lie to me again." Max
testified that he was shocked when Deborah left, and he had "[n]o money, no credit, no
automobile."

 Max's mother, Nell, testified that she loaned Max and Deborah $15,000 because Max
"wanted a nice house and I thought I would loan that to him to help him out." Nell testified
that she gave the remainder of the money to Max as a gift. (2) Nell testified that part of the
funds Max and Deborah used to build the garage for their home came from her. Nell
explained that Max and Deborah made payments to her only on the $15,000 promissory note. 
After Deborah left Max, Nell loaned Max $10,000 to purchase a truck.

 Max's son, Jason, testified that he had a good relationship with his father at the time
of Max's marriage to Deborah, but the relationship began to deteriorate after a couple of
years. Jason explained that Deborah "basically would tell me bad things . . . about my
father." He testified that Deborah would "[j]ust tell me that he really didn't like me, didn't
care for me too much, and just said that I wasn't his son, and all these horrible things."
According to Jason, Max "said that wasn't true; he never said anything like that." Jason
further explained that Deborah "would tell me horrible things about him, and she would tell
him horrible things about me. And she just basically made it to where we didn't want to be
around each other." Jason testified that he and his father did not speak until two weeks after
Deborah left Max. According to Jason, Deborah told him approximately two years before
she left his father that she planned to seek a divorce.

 According to Jason, Deborah spent $15,000 purchasing furniture for Heather's
apartment with Max's credit card. Jason also testified that Heather "was a bad driver and 
wrecked her car a lot, so they would have to help her out financially. . . ." Jason
further explained that Heather had lost two jobs "for drugs and stuff like that. And they
basically had to bail her out and help her pay her rent when she lost her jobs." Jason testified
that he observed Heather's drug problem "with my own eyes." Jason also testified that
Heather had in her possession credit cards and ATM cards that belonged to Max and
Deborah. According to Jason, Deborah told him she gave the cards to Heather "because she
couldn't leave at certain times, in order to get money."

 Jason's wife, Stacey, testified that Deborah tried to interfere with the relationship
between Jason and Max. According to Stacey, she only heard negative things about Max
from Debbie and Heather, and Deborah told her and Jason that Max "didn't really like us
when we came around[.]" Stacey testified that Deborah also "said that Max didn't think
Jason was his real son." Stacey explained that Deborah also told her that Max had no interest
in his grandchild and did not want to see her. Stacey testified that she now believes the
things Deborah said were not true. Stacey testified that Max became upset because "[h]e had
found financial statements when [Deborah and Heather] had gone to the bank to make a loan. 
Financial loans had come about and credit card debt that he didn't know about."

 Deborah Burgess testified that when she married Max, she moved into the Harris
County home, and she estimated that the home was worth approximately $30,000 in 1991.
Deborah testified that the value of the house was $90,000 when she and Max moved out in
2003. According to Deborah, she and Max made payments on the mortgage owed on the
Harris County home. Deborah and Max paid off the mortgage on that home in 1998, and she
and Max continued to reside there until 2003. According to Deborah, the Harris County
home flooded while she and Max were residing there. Most of their furniture was destroyed,
and Deborah testified that they had to replace it. Deborah denied that most of the items in
the house had belonged to Max before their marriage. Deborah testified that she and Max
received a check for $56,000 from the flood insurance company, and they deposited the
money into Max's savings account. Deborah denied withdrawing any of the $56,000 from
the savings account. Deborah testified that of the $56,000 settlement from their flood
insurance, she and Max spent $20,000 repairing the Harris County home and put the
remaining $36,000 into their community savings account.

 Deborah testified that she and Max signed a promissory note to Nell, in which they
agreed to repay Nell $15,000. Deborah explained that she and Max also received $48,000
from Nell, but she and Max did not sign a promissory note for that money. Deborah testified
that the $48,000 from Nell was a gift "[f]or us, for Max, for the garage." Deborah also
testified that the $18,000 for the purchase of the lot in Willis came from Max's 401(k) plan,
and Max repaid the money with funds from his paychecks. (3) According to Deborah, the
$21,900 she and Max used to build the garage at the Willis house came from Nell. Deborah
further testified that the $81,602 Max received from the Harris County home went toward
the purchase of the residence in Willis. Deborah explained that she and Max sold the Harris
County home in April of 2003, and they also purchased the property in Willis during the
same month.

 Deborah denied having debt and financial problems prior to the marriage, but she
admitted that she and Max consulted CCCS about setting up a repayment plan. Deborah
testified that she did not owe the debts prior to the marriage. Deborah explained that
although she received $18,000 from the sale of her hair salon, she had financial trouble due
to rent increases and "[f]rom having to take off so much" for vacations with Max. Deborah
testified that she put the $18,000 into their joint savings account. Deborah testified that when
she and Max married, she had no debt. Deborah denied that Max contributed any money
from his separate property savings toward the CCCS debt reduction plan. Rather, Deborah
accepted another job and repaid the CCCS herself. Deborah also denied making withdrawals
from Max's IRA. According to Deborah, she and Max did not have financial difficulties
until "the very end" of the marriage.

 Deborah testified that she and Max filed a Chapter 7 bankruptcy in early 2004. 
Deborah denied knowledge of precisely who incurred the credit card debt reflected in their
bankruptcy schedules. Deborah denied that she was the one who incurred most of the credit
card charges, which totaled $125,595, and she testified that Max knew about most of the
charges that were made. Deborah admitted that she currently owes $6,054 on a credit card
that she obtained since the bankruptcy, and she has received calls from collectors regarding
the debt. When asked whether she always discussed it with Max before applying for credit
cards, she testified, "I don't know."

 According to Deborah, Max gave his paychecks to her, and she paid the bills and
made some of the ATM withdrawals. Deborah denied giving Heather her credit cards and
ATM card. Deborah admitted that she purchased furniture for Heather, but she denied
paying for Heather's car repairs, apartment rent, or drug rehabilitation. Deborah testified that
Heather does not have a drug problem.

 Deborah testified that she and Max paid the flood insurance premiums on the Harris
County home from their joint checking account. Deborah also explained that the funds she
and Max received from the sale of the Harris County home "went directly to pay for the
down payment on the new house. . . ." Deborah testified that she and Max moved into the
Willis house in March of 2003. Deborah testified that Max also owns the home in which
Nell resides because Nell deeded the home to Max to prevent her daughter from inheriting
it. However, she also testified that she and Max did not pay taxes or insurance on the home. 
 Deborah denied taking any furniture or fixtures with her when she left Max. 
However, she testified that she took a 1999 Chevrolet Silverado. Deborah testified that she
was unable to meet her necessary monthly living expenses based upon her income, and she
requested that the court award her spousal support.

 In the divorce decree, the trial court granted Max a divorce from Deborah on the
ground of cruelty, and he awarded Max the Willis home; all household furniture, furnishings,
fixtures, goods, art objects, collectibles, appliances, and equipment in Max's possession or
subject to his sole control; all clothing, jewelry, and other personal effects in Max's
possession or subject to his sole control; all sums of cash in Max's possession or subject to
his sole control; and all sums in any retirement plan, 401(k) plan, or employee savings plan;
all insurance policies on Max's life; the 2002 Chevrolet Silverado; and a 1999 motor boat. 
The trial court awarded Deborah all household furniture, furnishings, fixtures, goods, art
objects, collectibles, appliances, and equipment in her possession or subject to her sole
control; all clothing, jewelry, and other personal effects in her possession or subject to her
sole control; all sums of cash in her possession or subject to her sole control; and the 1999
Chevrolet Silverado.

 With respect to the parties' debts, the trial court ordered Max to indemnify Deborah
and hold her harmless for the $54,200 balance due on the marital residence; all unsecured
debts, charges, liabilities, and obligations in Max's name; any debts, charges, liabilities, and
other obligations incurred solely by Max after the parties separated; and all taxes due or to
become due on the real and personal property awarded to Max. The trial court ordered
Deborah to pay any and all debts incurred solely by her after the parties separated or standing
in her name and all encumbrances, taxes, assessments, or other charges due or to become due
on the real and personal property awarded to Deborah.

 The trial court also awarded Max "for economic contribution of [Max's] separate
estate to the community estate[;]" $76,000 in equity from Max's former separate property
residence; $36,000 from insurance proceeds covering Max's former separate residence; and
$48,000 "in personal gifts of funds to [Max] from his mother." The trial court further found
that "the community estate is entitled to reimbursement from [Deborah's] separate estate for
funds expended to discharge all or part of an unsecured liability of [Deborah's] separate
estate and that Max . . . is entitled to a judgment of $15,000." The court decreed that "liens
for economic contribution and for reimbursement shall be and are satisfied by the award of
[Deborah's] interest in the community estate to [Max] to the extent the community estate is
not specifically awarded herein to [Deborah]." The trial court also entered findings of fact
and conclusions of law, as discussed more fully herein.

Standards of Review


 We review the trial court's findings of fact under the same legal standards applied to
sufficiency reviews of jury verdicts. Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996). In
considering whether the evidence is legally sufficient, we consider only the evidence and
inferences tending to support the trial court's finding and disregard all evidence to the
contrary. Anderson v. City of Seven Points, 806 S.W.2d 791, 794-95 (Tex. 1991). We must
consider the evidence in the light most favorable to the trial court's findings and indulge
every reasonable inference that would support them. See City of Keller v. Wilson, 168
S.W.3d 802, 822 (Tex. 2005). We must credit favorable evidence if a reasonable trier of fact
could and disregard contrary evidence unless a reasonable trier of fact could not. Id. at 827. 
However, we must not substitute our judgment for that of the trial court as long as the
evidence falls within the zone of reasonable disagreement. Id. at 822.

 In reviewing the factual sufficiency of the evidence, we must weigh all of the
evidence in the record. Ortiz, 917 S.W.2d at 772. We may overturn the trial court's findings
only if they are so against the great weight and preponderance of the evidence as to be clearly
wrong and unjust. Id. Findings of fact have the same force and dignity as a jury verdict. 
McGalliard v. Kuhlmann, 722 S.W.2d 694, 696 (Tex. 1986). However, when, as here, a
complete reporter's record appears in the appellate record, findings of fact are not conclusive
on appeal if the contrary is established as a matter of law, or if there is no evidence to support
the findings. Material P'ships, Inc. v. Ventura, 102 S.W.3d 252, 257 (Tex. App.--Houston
[14th Dist.] 2003, pet. denied); see also Tucker v. Tucker, 908 S.W.2d 530, 532 (Tex. App.--San Antonio 1995, writ denied).

 We review the trial court's conclusions of law de novo, and the standard of review is
whether they are correct. Material P'ships, 102 S.W.3d at 257. We will uphold conclusions
of law on appeal if the judgment can be sustained on any legal theory supported by the
evidence. Id. We review the trial court's decision regarding the grounds for divorce under
an abuse of discretion standard. Gonzalez v. Gonzalez, 383 S.W.2d 64, 65 (Tex. Civ. App.--San Antonio 1964, no writ). We also review the trial court's property division for abuse of
discretion. Murff v. Murff, 615 S.W.2d 696, 698 (Tex. 1981).

Issue One


 In her first issue, Deborah argues the trial court erred in characterizing community
property as Max's separate property. Specifically, Deborah complains that the trial court
erred in characterizing the following property as Max's separate property: (1) $15,000 paid
by Max toward Deborah's separate credit card debt; (2) $36,000 from casualty insurance
proceeds received when Max's separate property homestead flooded; and (3) $48,000
advanced to Max by his mother. (4)

 All property possessed by either spouse during marriage or upon dissolution of
marriage is presumed to be community property. Tex. Fam. Code Ann. § 3.003(a) (Vernon
2006). The community-property presumption may be rebutted by using the inception-of-title
rule, which provides that property's character is determined by the time and manner in which
a person first acquires an ownership interest in it. See Jensen v. Jensen, 665 S.W.2d 107, 109
(Tex. 1984); Zagorski v. Zagorski, 116 S.W.3d 309, 316 (Tex. App.--Houston [14th Dist.]
2003, pet. denied). Once property's character is established under the inception-of-title rule,
its character does not change merely because its form mutates. Chapman v. Allen, 15 Tex.
278, 284 (1855). Property owned before marriage, inherited property, and property received
as a gift is separate property. Tex. Const. art. XVI, § 15; Tex. Fam. Code Ann.
§ 3.001(1), (2); Tex. Fam. Code Ann. § 3.002 (Vernon 2006).

 A spouse who claims that property is separate must present clear and convincing
evidence of the property's separate character. Tex. Fam. Code Ann. § 3.003(b) (Vernon
2006). When separate and community property that are similar in nature have been
commingled, a spouse must use tracing to identify and segregate the portion of the property
that is separate. See Zagorski, 116 S.W.3d at 319-20 (Tracing is required to establish the
character of separate funds contained in a bank account containing commingled funds.). A
spouse is competent to testify about the character of his property; however, his testimony
usually must be corroborated by other testimonial or documentary evidence to rebut the
community-property presumption. See Bahr v. Kohr, 980 S.W.2d 723, 730 (Tex. App.--San
Antonio 1998, no pet.); Robles v. Robles, 965 S.W.2d 605, 620 (Tex. App.--Houston [1st
Dist.] 1998, pet. denied). A spouse's uncorroborated testimony that is contradicted "may not
meet the clear and convincing standard." Pace v. Pace, 160 S.W.3d 706, 714 (Tex. App.--Dallas 2005, pet. denied). A spouse's uncorroborated and uncontradicted testimony is
sufficient to constitute clear and convincing evidence. See id.

 With respect to the $15,000, Max testified that he paid $20,000 of Deborah's separate
property credit card debt using funds he owned before marriage. However, Deborah testified
that she did not owe any debt prior to the marriage. Although Deborah admitted that she and
Max consulted CCCS, she denied that Max contributed any money from his separate property
savings toward the debt reduction plan. Deborah testified that she accepted another job and
repaid CCCS herself. In finding of fact 10, the trial court found that the "separate estate of
Max Lindley Burgess paid $15,000 toward the unsecured liabilities of the separate estate of
Deborah Kay Burgess." In conclusion of law 25, the trial court determined that Max proved
by clear and convincing evidence that his separate estate was entitled to reimbursement in
the amount of $15,000.

 Max bore the burden of establishing by clear and convincing evidence that the
$15,000 he used to pay Deborah's debt was his separate property. Tex. Fam. Code Ann. 

§ 3.003(b). Max testified that he paid $20,000 from his savings account using funds that he
had acquired prior to the marriage. However, Max did not testify regarding the balance of
the savings account prior to the marriage, nor did he provide the date or an approximate time
frame as to when he paid Deborah's credit card debt. Furthermore, Max testified that he and
Deborah deposited community funds into the account during their marriage, yet he offered
no evidence tracing the funds in the savings account. See Zagorski, 116 S.W.3d at 319-20. 
Although Max offered some evidence that he paid Deborah's pre-marriage credit card debt
using $20,000 of his separate property funds, Max did not demonstrate the separate character
of the funds by clear and convincing evidence. (5) See Tex. Fam. Code Ann. § 3.003(b). 
Because Max did not demonstrate the separate character of the funds by clear and convincing
evidence, we find that the evidence is factually insufficient to support the trial court's
finding.

 With respect to the $36,000 of casualty insurance proceeds Max received when his
separate residence flooded, the parties both testified that the residence belonged to Max prior
to their marriage. Therefore, the evidence was legally and factually sufficient to demonstrate
that the residence was Max's separate property. See Tex. Const. art. XVI, § 15; Tex. Fam.
Code Ann. § 3.001(1), (2); Tex. Fam. Code Ann. § 3.002. We now turn to the question of
whether the insurance proceeds received when the residence flooded constitute community
property or separate property. The proceeds of a casualty insurance policy take their
character from the property that is insured. Tex. Fam. Code Ann. § 3.008(a) (Vernon 2006);
see McIntire v. McIntire, 702 S.W.2d 284, 288 (Tex. App.--Houston [1st Dist.] 1985, writ
ref'd n.r.e.). Hence, the proceeds of a policy insuring separate property are separate property,
while the proceeds of a policy insuring community property are community property. Tex.
Fam. Code Ann. § 3.008(a). If a policy insures both community and separate property, the
proceeds of the policy will be apportioned between the community and separate estates. See
First Nat'l Bank in Houston v. Finn, 132 S.W.2d 151, 153 (Tex. Civ. App.--Galveston 1939,
writ dism'd).

 Here, Max testified that he received a settlement totaling $56,000 from the flood
insurance company, and that the settlement covered both structural damage to the home and
personal property damage. The parties lived in the residence as husband and wife for at least
thirteen years. Max offered no evidence regarding whether the items of personal property
in the home were community property, his separate property, or Deborah's separate property,
nor did he testify as to the value of any of the property. Max had the burden to prove by clear
and convincing evidence that the remaining $36,000 of insurance proceeds for which he
sought contribution represented compensation for the loss of his separate property. See Tex.
Fam. Code Ann. § 3.003(b). We find that the evidence is factually insufficient to support
the trial court's finding. 

 Deborah also argues in issue one that the trial court erred in characterizing $48,000 
advanced to Max by Nell as Max's separate property. In finding of fact 13, subsection (iii),
the trial court found that Max was entitled to economic contribution for the $48,000 in funds
"received exclusively by him as gifts from his mother." Implicit in the trial court's finding
that the $48,000 was a gift from Nell is a determination that the $48,000 is separate property. 
See Tex. Const. art. XVI, § 15; Tex. Fam. Code Ann. § 3.001(1), (2); Tex. Fam. Code
Ann. § 3.002 (Property acquired by gift is separate property.). Nell testified unequivocally
that with the exception of a $15,000 loan, the money she advanced to Max was a gift to him. 
Deborah testified that the $48,000 was a gift "[f]or us, for Max. . . ." Max's testimony
regarding whether the $48,000 was a gift or a loan was unclear, equivocal, and sometimes
contradictory. When asked whether he considered the $48,000 a gift or a loan, Max initially
testified, "I guess a gift." However, Max equivocated during both the remainder of his direct
examination and cross-examination regarding whether he believed the $48,000 from Nell
was a gift or a loan.

 A gift is a transfer of property made voluntarily and gratuitously, without
consideration. Hilley v. Hilley, 161 Tex. 569, 342 S.W.2d 565, 569 (Tex. 1961); Ellebracht
v. Ellebracht, 735 S.W.2d 658, 659 (Tex. App.--Austin 1987, no writ). "Three elements are
necessary to establish the existence of a gift: (1) intent to make a gift; (2) delivery of the
property; and (3) acceptance of the property." Hayes v. Rinehart, 65 S.W.3d 286, 289 (Tex.
App.--Eastland 2001, no pet.). The intent of the donor is the principal issue in determining
whether a transfer constitutes a gift. Id. Here, Nell clearly testified that she intended the
funds as a gift. Although Max's testimony was at best equivocal as to whether he viewed 
the $48,000 as a gift or a loan, the evidence clearly and convincingly demonstrated Nell's
donative intent and delivery, as well as Max's acceptance of the funds. See Hayes, 65
S.W.3d at 289. The evidence is factually sufficient to support the trial court's finding that
the $48,000 constituted a gift to Max. We sustain issue one in part and overrule it in part.

Issue Two


 In her second issue, Deborah contends the trial court erred in awarding Max's claims
for reimbursement and economic contribution. Specifically, Deborah asserts the trial court
erred in awarding Max $15,000 reimbursement for paying Deborah's separate credit card
debt, as well as contribution for $76,000 from the sale of his separate property residence,
$36,000 from insurance flood insurance proceeds after Max's separate property residence
flooded, and $48,000 advanced to Max by his mother. With respect to the trial court's
finding that Max advanced $15,000 of his separate property funds to repay Deborah's
separate estate, thereby giving rise to a claim for reimbursement, we have found that the
evidence was insufficient to support Max's contention that the $15,000 was his separate
property. Therefore, Max's claim for reimbursement of those funds necessarily fails. 
Furthermore, we have found that the evidence was insufficient to support Max's claim that
the entire $36,000 of casualty insurance proceeds constituted his separate property.

 We now turn to the trial court's awards of $48,000 and $76,000 in contribution claims
to Max for the gift from Nell and the proceeds of the sale of his separate property residence. 
To uphold the trial court's findings that Max contributed $48,000 and $76,000 to the
community estate from the gift and from the sale of his separate property, we must find that
they are supported by clear and convincing evidence. See Tex. Fam. Code 
Ann. §§ 3.003(b), 3.403 (Vernon 2006). Both Max and Deborah testified that Max received
$81,602 when he sold his separate residence. Deborah testified that all of those proceeds
went toward the purchase of the community residence in Willis. The parties both testified
that the $48,000 from Nell was used to build a garage and make other improvements to the
Willis residence.

 Deborah apparently does not dispute that the Harris County residence was Max's
separate property, that Max put at least $76,000 of the proceeds from the sale of the residence
toward the purchase of the community residence in Willis, or that Max put the gift from Nell
toward the Willis residence. Rather, Deborah seems to argue that the trial court erred by not
taking into consideration the community funds that were paid toward the mortgage and
improvements to the Harris County residence. Max did testify that for seven years of the
marriage, he paid the mortgage on his separate property residence using community funds. 
Deborah testified that she and Max used community funds to make numerous improvements
to the residence before selling it in 2003. Deborah's argument that the trial court erred by
failing to consider the community estate's investment in Max's separate property amounts
to a claim for contribution or reimbursement, and she did not raise such a claim in the trial
court. See Tex. R. App. P. 33.1(a). We find the evidence clearly and convincingly showed
that Max put at least $76,000 of his separate property toward the marital residence. We have
also found that the evidence clearly and convincingly demonstrated that Max received
$48,000 as a gift from Nell.

 The trial court stated that in calculating the amount of Max's contribution claims, it
applied the statutory formula, which provides as follows:

 (a) A marital estate that makes an economic contribution to property owned
by another marital estate has a claim for economic contribution with respect
to the benefited estate.


 (b) The amount of the claim under this section is equal to the product of:


 (1) the equity in the benefited property on the date of the dissolution
of the marriage . . . multiplied by 


 (2) a fraction of which:


 (A) the numerator is the economic contribution to the property
owned by the benefited marital estate by the contributing marital estate;
and


 (B) the denominator is an amount equal to the sum of:


 (I) the economic contribution to the property owned by
the benefited marital estate by the contributing marital
estate; and


 (ii) the contribution by the benefited estate to the equity
in the property owned by the benefited estate.


 (b-1) The amount of the contribution by the benefited marital estate under
Subsection (b)(2)(b)(ii) is measured by determining:


 (1) if the benefited estate is the community property estate:


 (A) the net equity of the community property estate in the
property owned by the community property estate as of the date of the
first economic contribution to that property by the contributing separate
property estate; and


 (B) any additional economic contribution to the equity in the
property owned by the community property estate made by the
benefited community property estate after the date described by
Subdivision (A). . . . 


Tex. Fam. Code Ann. § 3.403(a), (b), (b-1) (Vernon 2006).

 Max estimated that the Willis home is currently worth approximately $215,000. 
Deborah testified that including the improvements she and Max made to the home, she
believed the marital residence in Willis was worth $260,000. According to Deborah's
inventory and appraisement, which she introduced into evidence at trial, the current market
value of the home was $246,850.39, and the mortgage balance was $52,243.61, leaving a net
equity of $194,606.78 in the property. According to the "divorce inventory summary sheet"
Max introduced into evidence, the value current value of the home was $220,000, the
"liability value" was $50,000, which leaves a net equity of $170,000 in the property. In its
findings of fact, the trial court found that the "value of the community marital residence was
at least $220,000 and the loan balance against such property was approximately $53,000." 
However, the trial court did not make a finding regarding the "net equity of the community
property estate in the property owned by the community property estate as of the date of the
first economic contribution to that property by the contributing separate property estate[.]" 
Tex. Fam. Code Ann. § 3.403(b-1)(1)(A). Therefore, on this record, we cannot ascertain
whether the trial court correctly applied the statutory formula in determining the amount of
Max's contribution claim for funds from the sale of his separate property and the gift from
Nell. Accordingly, we sustain issue two in part and overrule it in part, as explained above.

Issue Three


 In her third issue, Deborah argues the trial court "erred in offsetting Max's
reimbursement and economic contribution claims" against Deborah's community interest in
the Willis residence. We have already held that Max's reimbursement claim and his
economic contribution claim for $36,000 from insurance proceeds was not supported by
sufficient evidence. Therefore, we need not address issue three as to those claims. 

 We now turn to the offset of Max's $48,000 and $76,000 contribution claims for the
gift from Nell and the funds from the sale of his separate property residence. Section
3.403(a) of the Family Code provides that a marital estate that makes an economic
contribution to property owned by another marital estate has a claim for economic
contribution with respect to the benefitted estate. Tex. Fam. Code Ann. § 3.403(a) (Vernon
2006). As discussed above, the trial court correctly found that Nell gave Max $48,000,
which he used to build a garage at the Willis house, and that Max put at least $76,000 of
proceeds from the sale of his separate property toward the purchase of the marital residence
in Willis. As explained in our discussion of issue two, on this record, we cannot ascertain
whether the trial court correctly calculated Max's contribution claims. Accordingly, we
sustain issue three in part and overrule it in part.

Issue Four


 In her fourth issue, Deborah asserts the trial court erred in granting the divorce on
grounds of cruelty. Although Max pled as grounds for both cruelty and insupportability due
to discord or conflict of personalities, the trial court only found that Deborah was guilty of
cruelty and granted the divorce on that basis. We review the trial court's decision for abuse
of discretion. See Gonzalez, 383 S.W.2d at 65.

 Cruelty is one of the fault grounds for divorce. Tex. Fam. Code Ann. § 6.002
(Vernon 2006); Phillips v. Phillips, 75 S.W.3d 564, 569 n.3 (Tex. App.--Beaumont 2002, no
pet.). A divorce may be granted in favor of one spouse on the ground that the other spouse's
cruel treatment toward the complaining spouse rendered further living together insupportable. 
Tex. Fam. Code Ann. § 6.002 (Vernon 2006). Cruel treatment is a relative term, and each
case must be determined on its own facts. Mobley v. Mobley, 263 S.W.2d 794, 794-95 (Tex.
Civ. App.--Waco 1953, no writ). Cruel treatment requires willful and persistent infliction
of unnecessary suffering. Gentry v. Gentry, 394 S.W.2d 544, 546 (Tex. Civ. App.--Corpus
Christi 1965, no writ). The treatment must be of such a nature that it renders further living
together insupportable. See Henry v. Henry, 48 S.W.3d 468, 473 (Tex. App.--Houston [14th
Dist.] 2001, no pet.); Tex. Fam. Code Ann. § 6.002. The suffering may be mental or
physical, and it may consist of many different acts or combinations of misconduct. Mobley,
263 S.W.2d at 794. Although any one of several acts standing alone might not constitute
cruel treatment, the accumulation of the acts may be sufficient to justify the granting of a
divorce on ground of cruelty. Emerson v. Emerson, 409 S.W.2d 897, 900 (Tex. Civ. App.--
Corpus Christi 1966, no writ).

 Here, the trial court found that Deborah "is guilty of cruel treatment toward
Max . . . of a nature that renders further living together insupportable." The trial court heard
evidence that Deborah refused to engage in sexual relations with Max for nine years. There
was also evidence that Deborah spent a large amount of money without Max's knowledge
or consent, and that Deborah's unauthorized spending had depleted their savings, leaving
Max with no savings, ruined credit, and unable to retire. Max testified that Deborah refused
to allow him to see their bank statements because she "cooked the books" throughout their
marriage. Max also testified that Deborah withdrew funds from his 401(k) and IRA without
his consent. Max also testified that his reading and comprehension skills were limited, and
Deborah handled the couple's finances. Jason and Stacey testified that Deborah damaged
Jason's relationship with Max. In addition, Stacey testified that Deborah borrowed money
and incurred credit card debt without Max's knowledge. Under the totality of the
circumstances presented, we find the trial court did not abuse its discretion by granting a
divorce to Max on the ground of Deborah's cruelty. We overrule issue four.

Issue Five


 In issue five, Deborah contends the "trial court abused its discretion in awarding Max
a disproportionate division of the community estate." The Family Code provides that a trial
court "shall order a division of the estate of the parties in a manner that the court deems just
and right, having due regard for the rights of each party. . . ." Tex. Fam. Code Ann. § 7.001
(Vernon 2006). A trial court has wide latitude in dividing the estate of the parties, and may
consider many factors in making a just and right division of the property. Murff, 615 S.W.2d
at 698-99. Therefore, absent an abuse of discretion, we will not disturb the trial court's
division of property on appeal. Id. at 698. If substantive and probative evidence supporting
the trial court's decision exists, the trial court does not abuse its discretion by ordering an
unequal division of the marital estate. Id. at 698-99. "The division of the marital estate need
not be equal, and fault is one of the many factors that a trial court may consider in making
a division of the community estate." Ohendalski v. Ohendalski, 203 S.W.3d 910, 914 (Tex.
App.--Beaumont 2006, no pet.). In a fault-based divorce, the trial court "may consider the
conduct of the errant spouse in making a disproportionate distribution of the marital estate." 
Id.

 Here, the trial court's findings of fact and conclusions of law expressly stated that in
awarding a disproportionate share of the community estate to Max, the court took into
account the liens in favor of Max for contribution and reimbursement. The divorce decree
also stated that "the liens for economic contribution and for reimbursement shall be and are
satisfied by the award of [Deborah's] interest in the community estate to [Max] to the extent
the community estate is not specifically awarded herein to [Deborah]." We decline to hold
that the trial court abused its discretion by deciding to award a disproportionate division of
the community estate to Max. However, we reverse and remand because the trial court's
errors in characterizing certain property, as well as the granting of Max's reimbursement
claim for $15,000 and his contribution claim for $36,000 in flood insurance proceeds
necessarily affected the accuracy of the property division in this small estate. See Scott v.
Scott, 805 S.W.2d 835, 841 (Tex. App.--Waco 1991, writ denied) (Reversible error occurs
if the trial court's mischaracterization of property materially affected the trial court's "just
and right" property division.). We sustain issue five to that extent.

Conclusion


 We affirm the trial court's judgment of divorce on the ground of cruelty, and we
reverse and remand the property characterization and division for a new trial. See McClary
v. Thompson, 65 S.W.3d 829, 839 (Tex. App.--Fort Worth 2002, pet. denied) (Appellate
courts may sever the divorce action from the property division by affirming the divorce
action and remanding only the property division.).

 AFFIRMED IN PART; REVERSED AND REMANDED IN PART.





 

 STEVE McKEITHEN

 Chief Justice



Submitted on January 4, 2007

Opinion Delivered May 24, 2007


Before McKeithen, C.J., Gaultney and Kreger, JJ.
1. Max later testified that he paid $4900 toward the mortgage after the marriage.
2. Nell testified (apparently erroneously) that she gave Max a gift of $63,000 in
addition to the $15,000 loan.
3. The parties stipulated that the $18,000 from the 401(k) constituted community
property.
4. As part of her argument in issue one, Deborah asserts that the trial court's finding
that she secretly converted $50,000 of community property is erroneous. However, because
this argument does not pertain to her stated issue one (i.e. the characterization of property as
separate or community), we do not address it.
5. We note that although the trial court found that Max's separate estate paid a debt of
Deborah's estate in the amount of $15,000, the trial court's findings erroneously state that
Max is entitled to reimbursement from the community estate rather than Deborah's separate
estate.