ACCEPTED
15-25-00140-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
9/16/2025 7:22 PM
CHRISTOPHER A. PRINE
CLERK

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
9/16/2025 7:22:41 PM
CHRISTOPHER A. PRINE
Clerk

## NO. 15-25-00140-CV

# In the Fifteenth Court of Appeals
# Austin, Texas

### IN RE POWERED BY PEOPLE AND ROBERT FRANCIS O'ROURKE,

*Relators*

ORIGINAL PROCEEDING FROM THE 348TH JUDICIAL DISTRICT
OF TARRANT COUNTY, TEXAS
TRIAL COURT NO. 348-367652-2025

## RELATOR'S REPLY IN SUPPORT OF
## PETITION FOR WRIT OF MANDAMUS

Mimi Marziani
Joaquin Gonzalez
Rebecca (Beth) Stevens
MARZIANI, STEVENS, AND GONZALEZ PLLC
500 W. 2nd Street, Suite 1900
Austin, TX 78701
mmarziani@msgpllc.com
jgonzalez@msgpllc.com
bstevens@msgpllc.com

Sean J. McCaffity
George (Tex) Quesada
SOMMERMAN, MCCAFFITY
QUESADA & GEISLER, L.L.P.
3811 Turtle Creek Boulevard, Suite 1400
Dallas, Texas 75219-4461
smccaffity@textrial.com
quesada@textrial.com

*Counsel for Relators*

# TABLE OF CONTENTS

Index of Authorities ............................................................................................ iii

Introduction ......................................................................................................... 1

Relevant Facts ..................................................................................................... 1

Argument ............................................................................................................. 3

    I.     The TRO Is an Unconstitutional Prior Restraint on Political Activity. ................................................................................................... 3

    II.    Respondent Abused its Discretion in Making Erroneous Legal Conclusions in the Original and Modified TRO. ................................ 7

        A.    Text, history, and structure show that the DTPA does not apply to political advertising. ..................................................... 9

            i.      The plain text of the DTPA ........................................... 9

            ii.     Legislative history and structure of Texas statutes ....... 15

        B.    Caselaw supports the DTPA's inapplicability to political activity. ................................................................................... 18

        C.    An Attorney General DTPA action must be based on at least the prospect of a consumer transaction. ......................... 20

    III.   The Trial Court Abused its Discretion in Denying Relators' Motion to Transfer Venue. ................................................................. 22

        A.    Venue is mandatory in El Paso County. ................................. 22

        B.    Tarrant County Cannot be Considered a Proper Venue. ......... 27

    IV.   The Trial Court Abused Its Discretion in Failing to Grant Reciprocal Discovery. ................................................................... 28

    V.    The Trial Court Abused its Discretion in Granting an Anti-Suit TRO. ............................................................................................. 30

Conclusion ......................................................................................................... 32

Certificate in Accordance with TEX. R. APP. P. 52.3(j) ...........................33

Certificate of Compliance ...............................................................33

Certificate of Service ....................................................................34

ii

# INDEX OF AUTHORITIES

**Cases**

*Arizona Free Enter. Club's Freedom Club PAC v. Bennett*,
    564 U.S. 721 (2011)..................................................................................4

*Arthur Andersen & Co. v. Perry Equip. Corp.*,
    945 S.W.2d 812 (Tex. 1997) .................................................................21

*Atkinson v. Arnold*,
    893 S.W.2d 294 (Tex. App.—Texarkana 1995, no writ)..........................31

*Brown v. Gulf Television Company*,
    306 S.W.2d 706 (Tex. 1957) .................................................................24

*Bryant v. Cady*,
    445 S.W.3d 815 (Tex. App.—Texarkana 2014, no pet.) ..........................12

*Buckley v. Valeo*,
    424 U.S. 1 (1976)....................................................................................4

*Camunas v. Nat'l Republican Senatorial Comm.*,
    570 F. Supp. 3d 288 (E.D. Pa. 2021)......................................................19

*Citizens United v. FEC*,
    558 U.S. 310 (2010)................................................................................6

*City of Fort Worth v. Rylie*,
    602 S.W.3d 459 (Tex. 2020) .................................................................10

*Davenport v. Garcia*,
    834 S.W.2d 4 (Tex. 1992) .......................................................................6

*Del Tufo v. Nat'l Republican Senatorial Comm.*,
    248 N.J. Super. 684 (N.J. Super. Ct. Ch. Div. 1991) ...............................8

*Del Tufo v. Nat'l Republican Senatorial Comm.*,
    591 A.2d 1040 (N.J. Super. Ct. Ch. Div. 1991) .....................................19

*Ellebracht v. Ellebracht*,
    735 S.W.2d 658 (Tex. App.—Austin 1987, no writ) ...............................13

*Ex parte Tucci*,
859 S.W.2d 1 (Tex. 1993) ...............................................................6

*Fix v. Flagstar Bank, FSB*,
242 S.W.3d 147 (Tex. App.—Fort Worth 2007, pet. denied).......................15

*Ford v. City State Bank of Palacios*,
44 S.W.3d 121 (Tex. App.—Corpus Christi–Edinburg 2001, no
pet.) ...............................................................................................14

*Golden Rule Ins. Co. v. Harper*,
925 S.W.2d 649 (Tex. 1996) ...............................................................31

*Heckman v. Williamson Cty.*,
369 S.W.3d 137 (Tex. 2012) ...............................................................22

*Helena Chem. Co. v. Wilkins*,
47 S.W.3d 486 (Tex. 2001) ................................................................16

*Hernandez v. C.I.R.*,
490 U.S. 680 (1989)..........................................................................12

*Hobson v. Moore*,
734 S.W.2d 340 (Tex. 1987) ...............................................................30

*In re City of Dallas*,
977 S.W.2d 798 (Tex. App.—Fort Worth 1998, orig. proceeding) ..............24

*In re Cont'l Airlines, Inc.*,
988 S.W.2d 733 (Tex. 1998) ...............................................................23

*In re Dole Food Co., Inc.*,
256 S.W.3d 851 (Tex. App.—Beaumont 2008)............................. 23, 24, 26

*In re Newton*,
146 S.W.3d 648 (Tex. 2004) .................................................................3

*In re Sanofi-Aventis U.S., LLC*,
711 S.W.3d 732 (Tex. App—15th Dist. 2025) ...........................................22

*In re State*,
489 S.W.3d 454 (Tex. 2016) (Willet, J., concurring in judgment) ...............26

iv

*Ineos USA, LLC v. Elmgren,*
  505 S.W.3d 555 (Tex. 2016) ......................................................................18

*Kinney v. Barnes,*
  443 S.W.3d 87 (Tex. 2014) .......................................................................5, 6

*Longview Sav. & Loan Ass'n v. Nabours,*
  673 S.W.2d 357 (Tex. App.—Texarkana 1984), *aff'd on other
  grounds,* 700 S.W.2d 901 (Tex. 1985) .........................................................20

*Lukasik v. San Antonio Blue Haven Pools, Inc.,*
  21 S.W.3d 394 (Tex. App.—San Antonio 2000, no pet.) ............................14

*Lutheran Ass'n of Missionaries & Pilots, Inc. v. Lutheran Ass'n of
  Missionaries & Pilots, Inc.,*
  No. Civ.03-6173, 2004 WL 1212083 (D. Minn. May 20, 2004) .................19

*Mother & Unborn Baby Care of North Texas, Inc. v. State,*
  749 S.W.2d 533 (Tex. App.—Fort Worth 1988, writ denied) ............... 20, 21

*Murdock v. Pennsylvania,*
  319 U.S. 105 (1943).....................................................................................7

*NexPoint Advisors, L.P. v. United Dev. Funding IV,*
  674 S.W.3d 437 (Tex. App.—Fort Worth 2023, pets. denied) ....................11

*Paxton v. Annunciation House, Inc.,*
  No. 24-0573, 2025 WL 1536224 (Tex. May 30, 2025) ................................9

*Pennington v. Singleton,*
  606 S.W.2d 682 (Tex. 1980) ................................................................. 17, 21

*PPG Indus., Inc. v. JMB/Houston Centers Partners, Ltd. P'ship,*
  146 S.W.3d 79 (Tex. 2004) (Brister, J.) ................................................ 16, 21

*Quick v. City of Austin,*
  7 S.W.3d 109 (Tex. 1998) ............................................................................9

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.,*
  487 U.S. 781 (1988).....................................................................................15

*Rosell v. Farmers Tex. Cnty. Mut. Ins. Co.,*
  642 S.W.2d 278 (Tex. App.—Texarkana 1982, no writ)..............................15

*State of Texas v. Life Partners*,
    243 S.W.3d 236 (Tex. App.—Waco 2007) ....................................................27

*Tex. State Troopers Ass'n, Inc. v. Morales*,
    10 F. Supp. 2d 628 (N.D. Tex. 1998) ....................................................7, 18

*Texas v. Ysleta del Sur Pueblo*,
    79 F. Supp. 2d 708 (W.D. Tex. 1999) ........................................................22

*TGS-NOPEC Geophysical Co. v. Combs*,
    340 S.W.3d 432 (Tex. 2011) ..................................................................9, 10

*Vill. of Schaumburg v. Citizens for a Better Env't*,
    444 U.S. 620 (1980) ......................................................................................15

*Vinson & Elkins v. Moran*,
    946 S.W.2d 381 (Tex. App.—Houston [14th Dist.] 1997, writ
    dism'd by. agr.) ............................................................................................13

*Walker v. Packer*,
    827 S.W.2d 833 (Tex. 1992) ....................................................... 27, 29, 30

*Woods v. Littleton*,
    554 S.W.2d 662 (Tex. 1977) ......................................................................16

*Woodworth v. Cortez*,
    660 S.W.2d 561 (Tex. App.—San Antonio 1983, writ ref'd n.r.e.) ..............11

*Word of Faith World Outreach Ctr. Church, Inc. v. Morales*,
    787 F. Supp. 689 (W.D. Tex. 1992), *rev'd on other grounds*, 986
    F.2d 962 (5th Cir. 1993) ............................................................................17

**Statutes**

TEX. BUS. & COM. CODE § 17.08(1) ....................................................................11

TEX. BUS. & COM. CODE § 17.41 ........................................................................21

TEX. BUS. & COM. CODE § 17.44 ....................................................................8, 17

TEX. BUS. & COM. CODE § 17.46 ............................................................ 8, 16, 17

TEX. BUS. & COM. CODE § 17.46(a) ..................................................................10

TEX. BUS. & COM. CODE § 17.47(a) ............................................... 20, 28

TEX. CIV. PRAC. & REM. CODE § 15.012 .............................................31

TEX. CIV. PRAC. & REM. CODE § 15.016 .............................................23

TEX. CIV. PRAC. & REM. CODE § 65.023(a) .........................................23

TEX. CIV. PRAC. & REM. CODE § 66.002(a) .........................................25

TEX. ELEC. CODE Title 15 ................................................................18

TEX. GOV'T CODE § 311.011(a) ..........................................................9

TEX. GOV'T CODE § 311.021 .............................................................10

TEX. GOV'T CODE § 312.005 ..............................................................9

## Other Authorities

*Advertise*, Webster's New Twentieth Century Dictionary 2d Ed. (Simon
& Schuster 1983) .............................................................................12

*Commerce*, Black's Law Dictionary (12th ed. 2024) .............................................10

*Donation*, Black's Law Dictionary (12th ed. 2024) .................................................11

H.R. Rep. No. 102-317, at 13 (1991) ...........................................................19

House Research Org., Bill Analysis, Tex. S.B. 1581 ("The Charitable
Telephone Solicitation Act") ..........................................................7

Press Release, Tex. Att'y Gen, *Attorney General Ken Paxton Takes
Action to Hold Robert Francis O'Rourke in Contempt for
Violating Court Order and Scamming Texans* (Aug. 12, 2025), ..................26

Press Release, Tex. Att'y Gen., *Attorney General Ken Paxton Secures
Extended TROs Against Beto O'Rourke, Preventing Additional
Financial Payoffs to Texas Politicians* (Sept. 4, 2025), ..............................26

Press Release, Tex. Att'y Gen., *Attorney General Ken Paxton Secures
Major Victory Stopping Runaway Democrats from Taking "Beto
Bribes" and Preventing Deceptive Fundraising* (Aug. 8, 2025), .................25

Samuel Johnson, *A Dictionary of the English Language* (London, W. Strahan 1755) (defining "commerce") ..........................................................10

Steven G. Calabresi, *The Right to Buy Health Insurance Across State Lines: Crony Capitalism and the Supreme Court*, 81 U. Cin. L. Rev. 1447, 1455 (2013) ..........................................................11

Tex. 75th Leg., R.S. (May 23, 1997) ..........................................................7

Tex. H.B. 18, 98th Leg., 2nd C.S. .......................................... 14, 18

Tex. S.B. 140, 89th Leg., R.S., Ch. 964 (Tex. 2025) ..............................17

Tex. S.B. 1581, 75th Leg., R.S. (1997) ..........................................17

*Trade*, Black's Law Dictionary (12th ed. 2024) ........................................10

Transcript of Hearing on S.B. 75. Before the Senate Subcommittee on Consumer Affairs, 63d Leg., R.S., at 20 (Feb. 2, 1973)..........................8, 16

**Rules**

Tᴇx. R. Cɪᴠ. P. § 87(3)(a)..........................................................27

# INTRODUCTION

On August 25, 2025, Relators filed a Petition for Writ of Mandamus ("Petition" or "Pet."), with a Motion for Emergency Relief. In a September 12, 2025 Order (the "Order"), this Court partially granted Relators' emergency motion, staying enforcement of the trial court's August 15 temporary restraining order (the "TRO"), but leaving in place the August 25, 2025 temporary restraining order (the "Antisuit TRO"). Now, Relators respectfully file this Reply to the State's Response to the Petition ("Response" or "Resp.").

# RELEVANT FACTS

On August 6, 2025—two days before filing this case—Paxton admitted he did not have "details" to support his claims against Relators and wanted to use an "investigation" to "find out if they've done anything inappropriate." MR.0497. To date, the State has produced no evidence for its central assertion "that Relators deceived consumers by claiming to solicit donations for political purposes and directing consumers to political fundraising platforms, such as ActBlue, but were actually using the donations to fund personal expenses for absent legislators." Order at 3, 22.

Rather, the State has repeatedly targeted statements of pure political speech to justify its actions. *See* SR.0015-0016, Order at 5. For instance, its most recent trial court brief identifies the following as continuing "deceptive acts":

1

- O'Rourke repeatedly encouraged donors to donate to Powered by People ("PxP") "to have the backs of our Texas Democrats in this fight." SR.0027, SR.0029.

- PxP maintains an ActBlue page encouraging donations to fight "Paxton, Abbott, and Trump." The page clearly states that "contribution[s] will benefit [PxP]." SR.0028.

- During the Fort Worth rally, which was publicly livestreamed (curiously, given that Relators were allegedly engaged in criminal activity), the video encouraged viewers to "Text FIGHT to 20377 to help Texas Democrats stop Trump's power grab" and were directed to PxP's ActBlue page, which asked donors, "Can you show your support for our fight for Texas by making a donation today?" SR.0028-0029.

- O'Rourke tweeted that PxP donated money to various Texas Democratic caucuses, which, according to the State, constituted "an apparent attempt to elide legal liability for Defendants' deceptive and illegal acts." SR.0029.

Relators, on the other hand, *have* presented evidence in the form of an unrebutted sworn declaration. MR.0050-0052. PxP has affirmed that:

- "Between June 1, 2025 (the relevant date from the Attorney General's Request to Examine) and the date of this declaration, no transfers of funds, or provision of other benefits, have been made by [PxP] to any Texas Democratic lawmaker," MR.0051;

- "All money received since June 1, 2025, by [PxP] were donations and no goods or services were provided to donors by [PxP] in exchange for any donation received," MR.0052;

- "[PxP] did not make any offers to fundraise or help pay for legislative fines, hotel, and travel expenses in exchange for any political action or restraint," MR.0052; *and*

- "[PxP] made no statements, representations or offers to public officials promising any benefit, pecuniary gain, or pecuniary advantage," MR.0052.

2

Furthermore, PxP operates transparently as a registered political organization which files regular, publicly available campaign finance reports with both the Federal Election Commission and the Texas Ethics Commission. MR.0050. As the Texas Supreme Court found significant in an analogous case, "nothing in the plaintiffs' verified pleadings . . . suggests that the plaintiffs or anyone else has previously contested [the party's] activities, even though they must be publicly reported." *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) ("[T]he *status quo* to be preserved is that of ART PAC's publicly reported and until now unchallenged activities over the past four years."). PxP engaged in strikingly similar speech, fundraising practices, and contributions to Democratic caucuses during the Democrats' 2021 quorum break and no action was taken.

## ARGUMENT

### I. The TRO Is an Unconstitutional Prior Restraint on Political Activity.

As this Court recently recognized, mandamus may issue when a temporary restraining order is improvidently granted. Order at 12 (citing *In re Newton*, 146 at 650-651). Here, "as in *In re Newton*, the temporary restraining order shot far past finding a likelihood of success on the merits and finally adjudicated the Relators' political speech to be illegal based merely on pleadings and a 'brief, non-evidentiary TRO hearing when substantial rights are involved and the issues are far from clear.'" Order at 13-14.

3

The State's assertions that Relators violated the Deceptive Trade Practices Act ("DTPA") fail on their face—the Attorney General's claims are simply not cognizable under the DTPA's plain language, as confirmed by legislative history and decades of usage. The State is not justified to *any* relief, much less a broad prior restraint of Relators' political speech and association.

Here, the TRO operates as a prior restraint, Order at 18, and the State seeks to expand this prior restraint by transforming the TRO into a temporary injunction, *see* SR.0035-0036. The TRO explicitly restricts Relators' political fundraising solicitations and political expenditures, which, in turn "necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Buckley v. Valeo*, 424 U.S. 1, 19 (1976); *see also Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734–35 (2011).

Moreover, despite arguing the TRO is narrow, Resp. at 38, the State itself has repeatedly interpreted it to bar Relators from engaging in core political speech. *See, e.g.,* SR.0015-0016. For instance, in its criminal contempt motion (and repeatedly in other filings and communications), the Attorney General relies on a particular statement O'Rourke allegedly made about ignoring the trial court's rules. But the full recording of O'Rourke's remarks shows that he was referring to the rules of

4

redistricting, not the rule of law. *See* MR.0114-0117.[1] In addition to manipulating O'Rourke's statements, the State has threatened *criminal contempt* for simply speaking on an issue of nationwide public interest. *See* MR.0114-0117.

The State's filings underscore that any version of the injunctive relief they request will necessarily be vague and overbroad and, as a result, chill protected speech. *Kinney v. Barnes*, 443 S.W.3d 87, 97 (Tex. 2014) (explaining that where the law allegedly violated is of "inherently contextual nature . . . even the most narrowly crafted of injunctions risks enjoining protected speech"). Accordingly, the State's assertion that "Relators are free to make any political statements they want, so long as they do not make deceptive statements to lure Texans into thinking they are making donations to be used for lawful political purposes," Resp. at 40, must be rejected for the precise reasons such arguments were rejected in *Kinney*. There, the plaintiff argued that if an allegedly defamatory restrained statement was later found to be true, "the defamer 'could speak confident in the knowledge that [the enjoined statement is] no longer defamatory.'" *Kinney*, 443 S.W.3d at 98. But, the Texas

---

[1] He said: "We want California, and New Jersey, and Illinois, and Maryland, and every other state . . . to redraw their Congressional Districts now, not wait for Texas to move first . . . . Listen, you may say to yourself 'Well, those aren't the rules.' There are no refs in this game. F** the rules. We are going to win whatever it takes. . . . ." MR.0115.

Supreme Court retorted, "how confident could such a speaker be when he is bound by an injunction not to speak?" *Id.*[2]

That is why prior restraints are presumptively unconstitutional under federal and state law. They are only permitted in Texas in the "most extraordinary circumstances" (1) when justified by "imminent, severe harm" as an essential way to avoid impending danger, and (2) when "no alternative exists to treat the specific threat" that would be less restrictive of free speech. *Davenport v. Garcia*, 834 S.W.2d 4, 10 (Tex. 1992); *accord Kinney*, 443 S.W.3d at 95. Texas courts require **proof** of these factors, not mere speculation and hyperbolic rhetoric. *Ex parte Tucci*, 859 S.W.2d 1, 6 (Tex. 1993). Not surprisingly, given this heavy burden, "our courts have repeatedly rejected both legislative and judicial attempts to restrict expression." *Id*. at 5; *see* Pet. at 46-48 (citing decades of case law).

Here, "the trial court concluded that Relators' 'fundraising conduct constitutes false, misleading, or deceptive acts' without any evidence to support those findings." Order at 22. However, the record instead shows constitutionally protected activity and lawful, protected contributions to likeminded Democratic caucus organizations

---

[2] The State cites O'Rourke's Aug. 13, 2025 interview with Gov. Newsom to claim the TRO is not overbroad. Resp. 41. But the interview shows the opposite: O'Rourke believed he complied while the State insists he violated it—uncertainty that chills speech. *Citizens United v. FEC*, 558 U.S. 310, 324 (2010) ("vague laws chill speech" because speakers must "guess at the law's meaning and differ as to its application").

in support of a common political goal. *Supra*, page 2-3. Not surprisingly, then, the State does not even attempt to argue that the TRO satisfies the requirements for a prior restraint on speech. *See generally* Resp. at 37-44. Thus, Respondent abused its discretion in granting the TRO and denying Relators' motion to dissolve it.

## II. Respondent Abused its Discretion in Making Erroneous Legal Conclusions in the Original and Modified TRO.

Over a month after filing its original petition and TRO, the State has, for the first time, attempted to articulate what service it claims Relators "advertised" to Texas donors: "crowdsourcing lawful political donations." Resp. at 20, 23. Notably, the State does not cite a single allegation suggesting Relators ever mentioned "crowdsourcing." Rather, the petition only alleges generalized fundraising messages such as "100% of your donation will go to supporting Texas Democrats." MR.0203. But setting that aside, *every* fundraising effort, from "[s]occer moms who want[] to raise money for their children's competition," to "the passing of the collection plate in church," implicitly involves aggregating donations from multiple individuals. House Research Org., Bill Analysis, Tex. S.B. 1581 ("The Charitable Telephone Solicitation Act"), Tex. 75th Leg., R.S. (May 23, 1997), at 3; *Murdock v. Pennsylvania*, 319 U.S. 105, 111 (1943). That does not transform every religious, charitable, or political fundraising request into a per se commercial transaction. *Cf. Tex. State Troopers Ass'n, Inc. v. Morales*, 10 F. Supp. 2d 628, 632 (N.D. Tex. 1998)

7

(charitable "solicitation is protected under the First Amendment to a greater extent than commercial speech.").

Text, history, and structure show the DTPA does not apply to political advertising. By its plain text, the statute covers only transactions in "trade or commerce," TEX. BUS. & COM. CODE § 17.46, which require exchange of consideration. Its stated overarching purpose is "to protect *consumers*." TEX. BUS. & COM. CODE § 17.44 (emphasis added). A gratuitous donation to a cause is simply not a commercial transaction. Accordingly, the authors of the DTPA explicitly rejected the DTPA's application to "political advertising." Transcript of Hearing on S.B. 75. Before the Senate Subcommittee on Consumer Affairs, 63d Leg., R.S., at 20 (Feb. 2, 1973) (hereinafter "SB 75 Legislative History").[3] Further, the Legislature has demonstrated that it knows how to regulate nonprofit fundraising when it wants to and has, in fact, created an intricate statutory scheme regulating political finance.

Courts in other states have similarly concluded that "the raising of funds for political purposes, whether at the national or local level, involves neither commercial goods nor commercial services." *Del Tufo v. Nat'l Republican Senatorial Comm.*, 248 N.J. Super. 684, 689 (N.J. Super. Ct. Ch. Div. 1991). Courts cannot read the DTPA to broadly regulate every political and charitable fundraising action based on a "service of crowdsourcing donations" theory given their "duty to harmonize

---

[3] Available at https://lrl.texas.gov/scanned/DTPA/SB75_63R.pdf.

8

statutes and to interpret them 'in a manner that avoids constitutional infirmity.'" *Paxton v. Annunciation House, Inc.*, No. 24-0573, 2025 WL 1536224, at \*13 (Tex. May 30, 2025) (quoting *Quick v. City of Austin*, 7 S.W.3d 109, 115 (Tex. 1998)).

The trial court abused its discretion by entering legally erroneous conclusions, including that "Defendants' fundraising conduct constitutes false, misleading, or deceptive acts under the Texas Deceptive Trade Practices Act." (MR.0391).

## A. Text, history, and structure show that the DTPA does not apply to political advertising.

### i. *The plain text of the DTPA*

When construing a statute, a court's "primary objective is to ascertain and give effect to the Legislature's intent." *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) (citing Tex. Gov't Code § 312.005). Courts "begin with the statute's words," *id.*, which "shall be read in context and construed according to the rules of grammar and common usage." Tex. Gov't Code § 311.011(a). "[W]ords' meanings cannot be determined in isolation but must be drawn from the context in which they are used." *TGS-NOPEC*, 340 S.W.3d at 441. Thus, courts "consider statutes as a whole rather than their isolated provisions." *Id.* at 439.

Further, in considering a statutory list, the canon of *noscitur a sociis* "directs that similar terms be interpreted in a similar manner." *Id.* at 441. Even when a statute

9

is unambiguous, courts avoid an interpretation if that "interpretation would lead to absurd results*." Id.* at 439. Accordingly, courts "presume[]" that the Legislature intends "compliance with the constitutions of this state and the United States" and "a just and reasonable result." TEX. GOV'T CODE § 311.021; *see also City of Fort Worth v. Rylie*, 602 S.W.3d 459, 468 (Tex. 2020) ("Courts must construe statutes to avoid constitutional infirmities.").

There is no dispute that the DTPA only applies to transactions made in "trade or commerce." TEX. BUS. & COM. CODE § 17.46(a). The key feature that distinguishes "trade" and "commerce" from non-commercial, gratuitous transactions is that trade and commerce involve the "exchange of one thing for another*."* Samuel Johnson, *A Dictionary of the English Language* (London, W. Strahan 1755) (defining "commerce"); *see also Commerce*, Black's Law Dictionary (12th ed. 2024) ("The exchange of goods and services"); *Trade*, Black's Law Dictionary (12th ed. 2024) ("The business of buying and selling or bartering goods or services"). Along those lines, the etymology of the word "Commerce" is:

> Commerce n. 1537, borrowed from Middle French commerce, learned borrowing from Latin *commercium* trade, trafficking (*com-* together, with + *merx*, genitive *mercis* wares, merchandise; see MARKET) . . . The root "mercis" refers in Latin to the buying and selling of goods or "merchandise . . . ."

10

Steven G. Calabresi, *The Right to Buy Health Insurance Across State Lines: Crony Capitalism and the Supreme Court*, 81 U. Cin. L. Rev. 1447, 1455 (2013) (quoting The Chambers Dictionary of Etymology).

The "common meaning" of a "commercial transaction" as "generally a business deal," *NexPoint Advisors, L.P. v. United Dev. Funding IV*, 674 S.W.3d 437, 448 (Tex. App.—Fort Worth 2023, pets. denied), is further confirmed in that the statute uses "trade and commerce" interchangeably with "business." Section 17.46 prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any *trade or commerce*," while § 17.44 identifies the purpose of the Act as "to protect consumers against false, misleading, and deceptive *business practices*." Elsewhere, in Subchapter B of Chapter 17 (which precedes Subchapter E, "the Deceptive Trade Practices-Consumer Protection Act,"), "commercial purpose" is defined as "a purpose that is intended to result in a profit or other tangible benefit." TEX. BUS. & COM. CODE § 17.08(1).

By contrast, a donation is "[a] gift, esp. to a charity." *Donation*, Black's Law Dictionary (12th ed. 2024). In turn, a "gift is a voluntary transfer of property to another made gratuitously and without consideration." *Woodworth v. Cortez*, 660 S.W.2d 561, 563 (Tex. App.—San Antonio 1983, writ ref'd n.r.e.). Consideration exists when a promisor obtains a benefit—"a legal right to which the promisor would not otherwise be entitled"—or the promisee incurs a legal detriment—"surrenders a

11

legal right that the promisee otherwise would have been entitled to exercise." *Bryant v. Cady*, 445 S.W.3d 815, 820 (Tex. App.—Texarkana 2014, no pet.). There is no consideration when an agreement, "at its inception, does not impose obligations *on both parties*." *Id.* (emphasis added). For a payment to constitute a "quid pro quo exchange" rather than a donation, the payor must receive an "identifiable benefit." *Hernandez v. C.I.R.*, 490 U.S. 680, 691 (1989). Here, the State fails to even allege that Relators offered consideration to donors in exchange for their "donations." MR.0198-218.

The State acknowledges that they are targeting "donations," *see, e.g.*, Resp. at 6, but attempts to isolate individual words in the statutory definition of trade and commerce to justify its overreach. However, the statutory definition comports with the plain meaning of the words. Each predicate in the definition—advertising, offering for sale, sale, lease, distribution—has an inherently commercial flavor. The State focuses on "advertising," Resp. at 19-22, which the statute does not further define. Looking at its common usage, the primary definitions emphasize its commercial nature: "To call the public's attention to things for sale." *Advertise*, Webster's New Twentieth Century Dictionary 2d Ed. (Simon & Schuster 1983).

The State, for the first time, claims that Relators advertised the "service" of "crowdsourcing lawful political donations." Resp. at 20. The State does not identify how Relators "advertised" this "service of crowdfunding"—for example, they do not

12

cite messages stating, "if you donate money, we will raise money from other people." But to the extent all charitable, religious, and political fundraising implicitly seeks donations from multiple individuals, it defies logic to suggest that donors donate to nonprofits "for the principal purpose" of having other people also donate. *Vinson & Elkins v. Moran*, 946 S.W.2d 381, 408 (Tex. App.—Houston [14th Dist.] 1997, writ dism'd by. agr.).

Collecting donations from other individuals is not offered by nonprofit organizations as consideration to donors "*in exchange for*" for their donations. *Ellebracht v. Ellebracht*, 735 S.W.2d 658, 659 (Tex. App.—Austin 1987, no writ) (distinguishing between a gift and a sale). For example, if Relators collected a donation from Donor A, Donor A could not sue Relators for breach of contract for failing to also collect donations from other donors. The donor obtained no legal right from Relators in exchange for their donation, nor did Relators give up a legal right which they otherwise might have exercised. Any donations were purely gratuitous: "Your contribution will benefit [PxP]." MR.0203.

Ironically, the Legislature addressed "crowdfunding" this year by creating a tort action for "fraudulent crowdfunding," which is defined as "collecting donations on behalf of a donee with the intent to keep the donations instead of giving the donations to the donee." Tex. H.B. 4281, 89th Leg., R.S. (2025). The phrases "collecting donations," "giving," and "donee" are all conspicuously absent from the

13

DTPA, nor does the legislative history suggest the DTPA already applied to this activity.

Even more to the point, the Legislature *just* passed a law to regulate the activity the State seeks to punish under the DTPA. H.B. 18 would prohibit political committees from, *inter alia*, "mak[ing] a political expenditure for travel, food, or lodging expenses in connection with" a legislator's absence. Tex. H.B. 18, 98th Leg., 2nd C.S. (bill sent to the Governor's desk on Sept 5). The legislative history makes no mention of the DTPA.

The State briefly suggests that Relators distributed goods by "paying the personal expenses of unexcused Texas legislators." Resp. at 23. It bears repeating that the only competent evidence is a sworn statement that "no transfers of funds, or provision of other benefits, have been made by [PxP] to any Texas Democratic lawmaker." MR.0051. But proceeding *arguendo*, the State's position fails because courts look at the parties' relationship to the transaction that forms the basis of the DTPA complaint itself. *See, e.g.*, *Lukasik v. San Antonio Blue Haven Pools*, *Inc.*, 21 S.W.3d 394, 403 (Tex. App.—San Antonio 2000, no pet.) (denying DTPA claim to purchaser of a pool where basis of complaint was a pool alarm purchased by pool installer, not by pool purchaser); *Ford v. City State Bank of Palacios*, 44 S.W.3d 121, 135 (Tex. App.—Corpus Christi–Edinburg 2001, no pet.) (denying DTPA claim where the basis of the complaint was a loan, rather than the transaction for

14

goods purchased by the loan proceeds); *Rosell v. Farmers Tex. Cnty. Mut. Ins. Co.*, 642 S.W.2d 278, 279 (Tex. App.—Texarkana 1982, no writ) ("post-sale conduct of an insurer is not conduct occurring in connection with the purchase of goods or services."). Here, the basis of the complaint—the supposed injury to "Texas consumers," MR.0002—is the donation, not the expenditure. Secondarily, "money is considered neither a good nor a service." *Fix v. Flagstar Bank, FSB*, 242 S.W.3d 147, 160 (Tex. App.—Fort Worth 2007, pet. denied). Nor, even if they had occurred, would donations to legislators constitute commercial transactions—the legality of "political contributions" and "gifts" is regulated by the Election and Penal Codes.

Finally, the State's interpretation of the DTPA would lead to absurd results and constitutional conflicts. Under its reading, a politician's fundraising email (providing the "service of crowdsourcing political donations") touting their support for a particular policy could violate the DTPA if their policy position later changes. Failing to limit the DTPA to commercial transactions would raise serious constitutional concerns by restricting core protected speech. *See, e.g.*, *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 794–96 (1988); *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 620–21, (1980).

### ii.    *Legislative history and structure of Texas statutes*

As this Court noted, despite the DTPA's fifty-two year history, "the State fails to cite a single case in which the DTPA has been interpreted to apply to political

solicitations or political speech in the DTPA's half century of existence, despite the raucous nature of Texas's political climate over the spanning decades." Order at 14-15. This is no coincidence, the "DTPA's primary goal was to protect consumers by encouraging them to bring consumer complaints." *PPG Indus., Inc. v. JMB/Houston Centers Partners*, *Ltd. P'ship*, 146 S.W.3d 79, 84 (Tex. 2004) (Brister, J.)*; Woods v. Littleton*, 554 S.W.2d 662, 669 (Tex. 1977) ("[T]he legislative intent [was] to encourage aggrieved consumers to seek redress and to deter unscrupulous sellers who engage in deceptive trade practices."). Given that political fundraising is not among the 34 examples of deceptive acts and practices listed in the DTPA, legislative intent is essential to ascertain whether the legislation meant to expand the law beyond its plain text. TEX. BUS. & COM. CODE § 17.46; *see PPG Indus., Inc.*, 146 S.W.3d at 84 ("A statute's silence can be significant.").

In determining legislative intent, a court may consider several factors, including "legislative history" and "laws on the same or similar subjects." *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001). Here, the Bill's author, Representative Joe Longley, expressly rejected the premise that political solicitation is covered by the DTPA when asked if the statute "would apply to political advertising." SB 75 Legislative History, *supra*, at 20 ("nothing applies to political advertising"). The Chairman of the Subcommittee on Consumer Affairs and Texas Senator, Ron Clower, supported Longley's assertion. *Id*.

16

When "construing the DTPA," the "primary emphasis is on the intention of the legislature." *Pennington v. Singleton*, 606 S.W.2d 682, 686 (Tex. 1980). The DTPA "shall be liberally construed and applied to promote its underlying purposes, which *are to protect consumers* against false, misleading, and deceptive *business practices . . . .*" *Word of Faith World Outreach Ctr. Church, Inc. v. Morales*, 787 F. Supp. 689, 697 (W.D. Tex. 1992), *rev'd on other grounds*, 986 F.2d 962 (5th Cir. 1993) (quoting TEX. BUS. & COM. CODE § 17.44) (emphasis in original). As much as Paxton attempts to contort the language of the DTPA to meet his political goals, this intent is inescapable.

Further, the Legislature has demonstrated that it knows how to regulate both for-profit and nonprofit fundraising when it wants to. For example, the Texas Law Enforcement Telephone Solicitation Act ("TETSA") prohibited an "unfair or deceptive act or practice in the conduct of solicitations for a charitable organization." Tex. S.B. 1581, 75th Leg., R.S. (1997). Again, charitable, religious, or political fundraising is found nowhere among the DTPA's enumerated deceptive acts and practices. TEX. BUS. & COM. CODE § 17.46. The Legislature later limited the scope of TETSA by amending § 13(a), so it applied only to "making a telephone solicitation for a law enforcement-related charitable organization." Tex. S.B. 140, 89th Leg., R.S., Ch. 964 (Tex. 2025); *see Texas State Troopers Ass'n, Inc. v.*

17

*Morales*, 10 F. Supp. 2d at 632 (holding that portions of TETSA violated First Amendment).

Similarly, the Legislature has an entire subchapter of code "regulating the collection or solicitation by for-profit entities of certain public donations," which does not provide the same injunctive relief as the Attorney General can seek under the DTPA, § 17.47. The Legislature's use of "donations" in one section of code but omission of "donation" in the DTPA indicates the Legislature did not intend for such transactions to be covered. *See Ineos USA, LLC v. Elmgren*, 505 S.W.3d 555, 563 (Tex. 2016).

The Legislature has also proven itself capable of regulating political fundraising. *See generally*, TEX. ELEC. CODE Title 15; H.B. 18, *supra* at 14. As this Court noted, if Relators violated any laws, "such activities can be punished after the fact by the remedies in the Texas Election or Penal Codes." Order at 2. The Legislature's established statutory schemes do not permit the Attorney General to turn a *consumer* protection statute into a weapon against his political opponent for engaging in noncommercial political speech.

**B.     Caselaw supports the DTPA's inapplicability to political activity.**

Courts in other jurisdictions have considered analogous consumer protection statutes and concluded that political activity is not covered because it involves no "commercial goods" or "commercial services." As one court wrote:

> By way of clear distinction, the raising of funds for political purposes, whether at the national or local level, involves neither commercial goods nor commercial services. In essence, said activity involves the promotion and marketing of concepts dealing primarily with societal ideas . . . . It should be obvious that those who are solicited for political contributions are not being approached in their commonly accepted capacity as consumers.

*Del Tufo v. Nat'l Republican Senatorial Comm.*, 591 A.2d 1040, 1042 (N.J. Super. Ct. Ch. Div. 1991); *see also Lutheran Ass'n of Missionaries & Pilots, Inc. v. Lutheran Ass'n of Missionaries & Pilots, Inc.*, No. Civ.03-6173, 2004 WL 1212083, at *4 (D. Minn. May 20, 2004) ("charitable donations are not the sale of services or intangibles, and thus are not 'merchandise' under the Consumer Fraud Act"). Similarly, in interpreting the federal Telephone Consumer Protection Act, courts have noted that Congress distinguished between charitable or political solicitation and commercial solicitation, and found that "'solicitations by [tax-exempt charitable and political] organizations were less of a problem than commercial calls." *Camunas v. Nat'l Republican Senatorial Comm.*, 570 F. Supp. 3d 288, 299–300 (E.D. Pa. 2021) (quoting H.R. Rep. No. 102-317, at 13 (1991)) (alteration in original). Congress thus made a "commercial speech' distinction consistent with Supreme Court precedent." *Id.* This distinction is further confirmed by Texas courts repeatedly emphasizing that the DTPA does not apply to "gratuitous acts," where no purchase of goods or services occurs. *See, e.g., Longview Sav. & Loan Ass'n v.*

19

*Nabours*, 673 S.W.2d 357, 362 (Tex. App.—Texarkana 1984), *aff'd on other grounds*, 700 S.W.2d 901 (Tex. 1985).

The State points to *Mother & Unborn Baby Care of North Texas, Inc. v. State*, 749 S.W.2d 533 (Tex. App.—Fort Worth 1988, writ denied), to make the case that the DTPA applies to services advertised but not distributed by a nonprofit. There, the defendant "intentionally, deceptively utilized [advertising] to bait women into believing they would receive services" for a fee. *Id.* at 542. Specifically, women were promised concrete, identifiable medical services—pregnancy testing, counseling and abortion—that they never received, some of which they intended to pay for, and the defendant never intended to deliver. *Id*. The defendant's conduct in *Mother & Unborn Baby* fell squarely within the commercial conduct of offering a "service," as regulated by the DTPA. It bears no resemblance to Relators' conduct here.

### C. An Attorney General DTPA action must be based on at least the prospect of a consumer transaction.

Although § 17.47 does not require identifying actual individual aggrieved consumers, the civil enforcement aspect of the DTPA nevertheless still exists in the context of its overall purpose. Thus, in the over 50 years the DTPA has existed, no court has ever held that the "*consumer* protection division," TEX. BUS. & COM. CODE § 17.47(a) (emphasis added), can bring DTPA suits to enjoin or penalize acts that could never even theoretically injure Texas consumers. The State certainly realizes

20

as much and has continuously attempted to portray Relator's fundraising as affecting consumers. *See, e.g.*, Resp. at 17 ("Preventing false and misleading representations that warp consumer financial decisions is plainly in the public interest . . . ."). "The Legislature did not intend the DTPA for everybody. It limited DTPA complaints to 'consumers,' and excluded a number of parties and transactions from the DTPA…." *PPG Indus.,* 146 S.W.3d at 85 (citing *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 815 (Tex. 1997).

In fact, the Attorney General is powerless to bring this action without such an injury, *i.e.*, without any "consumers" within the statutory definition whose rights will be protected. *See generally,* TEX. BUS. & COM. CODE §§ 17.41, *et seq.; see also Pennington,* 606 S.W.2d 682; *Mother,* 749 S.W.2d 533, 537 ("no doubt that the women concerned are "consumers" seeking to purchase a service upon which this complaint is based"). The State is only authorized to bring actions within its limited statutory grant of authority and if the injury alleged is entirely outside the scope of the DTPA, then the State has no injury and, thus, no statutory or constitutional standing. This is fatal because "Texas courts have consistently held that the Texas AG is powerless to act in the absence of explicit statutory or constitutional

authorization." *See Texas v. Ysleta del Sur Pueblo*, 79 F. Supp. 2d 708, 712 (W.D. Tex. 1999); *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 154 (Tex. 2012).[4]

Ultimately, the State articulates neither the injury nor the injured. Paxton instead asserts plenary authority to act on behalf of the public to address acts disconnected from the statutory authority it wields. But the DTPA, on its face, is not applicable to the injuries the State seeks to redress. And Relators, and this Court, are left to grapple with vague assertions of statutory injury under a statute never intended to curtail political advertising, donations, speech, or fundraising.

## III. The Trial Court Abused its Discretion in Denying Relators' Motion to Transfer Venue.

### A. Venue is mandatory in El Paso County.

"Mandamus relief is available to enforce mandatory venue provisions in civil cases." *In re Sanofi-Aventis U.S., LLC*, 711 S.W.3d 732, 735 (Tex. App—15th Dist. 2025). Here, venue is mandatory in El Paso County because the primary purpose of the State's suit is injunctive.

---

[4] Although this Court preliminarily concluded that the trial court had subject matter jurisdiction, Order at 12, Relators maintain that the unique nature of the Attorney General's statutory authority renders a typical standing analysis incomplete; rather, where the State fails to articulate a cognizable claim under an authorizing statute, it per se lacks any injury (as it has no independent interest outside of enforcing the statute) and hence lacks standing.

The legislature created a mandatory venue provision for lawsuits primarily seeking injunctive relief: such lawsuits "*shall* be tried in a district or county court in the county in which the party is domiciled." TEX. CIV. PRAC. & REM. CODE § 65.023(a) (emphasis added); *accord* TEX. CIV. PRAC. & REM. CODE § 15.016. The State does not dispute that PxP has its principal place of business in El Paso; indeed, the State first initiated legal proceedings in El Paso by serving a RTE on each of PxP's directors in El Paso. MR.0312-0337 at 6-9. Nor does the State dispute that O'Rourke is domiciled in El Paso. The State itself alleges that the acts giving rise to this lawsuit have occurred "across the state and the nation," with (at most) *de minimis* ties to Tarrant County. MR.0201. Instead, the State claims that its lawsuit is not primarily injunctive in nature, so Section 65.023(a) does not apply and the DTPA's permissive venue provisions control. Resp. at 27.

But "in cases where the plaintiff alleges it has no adequate remedy at law and hence is entitled to injunctive relief, the plaintiff has chosen the equitable relief as his primary remedy and venue is controlled by the injunction statute." *In re Dole Food Co., Inc.*, 256 S.W.3d 851, 854 (Tex. App.—Beaumont 2008). In determining the true nature of a case, Texas courts look to the relief sought by the allegations and prayer for relief. *In re Cont'l Airlines, Inc.*, 988 S.W.2d 733, 736 (Tex. 1998) (listing venue disputes where courts have relied upon prayer to determine nature of case); *In re City of Dallas*, 977 S.W.2d 798, 804 (Tex. App.—Fort Worth 1998, orig.

23

proceeding) ("When those pleadings show that the issuance of a permanent injunction is the primary and principal relief sought in the lawsuit, venue is mandatory in the county of the defendant's domicile.").

The State's own pleadings and actions demonstrate that the Attorney General has chosen equitable relief as his primary remedy.[5] The State effectively concedes as much before this Court, stating that the "relief the State [has] always sought" is injunctive in nature: "blocking the illegal use, raising, and offering of political contributions raised through ActBlue and other political platforms." Resp. at 42. That was the State's entire justification for seeking an emergency, *ex parte* restraint on speech—it claimed Relators' political activities threatened immediate injury and after-the-fact fines were insufficient. *Compare* MR.0011-0012 *with In re Dole Food Co., Inc.*, 256 S.W.3d at 855 ("Rather than seeking to hold the parties to the *status quo* until the issues in controversy are resolved, the plaintiff seeks substantial, permanent restraints on the defendants' speech and conduct.").

When the State filed its petition, it maintained this precise framing, claiming that injunctive relief is "necessary" to protect Texas consumers. MR.0002. The

---

[5] The State cites no authority for a supposed split between "legal" and "equitable" injunctions, much less for the proposition that statutory injunction remedies override the plain language of the Code's mandatory injunction venue provision. Rather, "where the petition discloses that the issuance of a perpetual injunction is the primary and principal relief sought, the special venue provisions . . . control." *See Brown v. Gulf Television Company*, 306 S.W.2d 706, 709 (Tex. 1957).

petition has an entire "injunctive relief" section, MR.0208-0211, and includes in its prayer for relief three detailed categories of "temporary and permanent" restraint, plus two additional pleas for "temporary injunctive relief," MR.0211-0212. The main substantive addition to the amended petition was to add "information in the nature of quo warranto," setting the stage to contemporaneously file a motion for leave to file a quo warranto action seeking "to judicially forfeit Defendant [PxP]'s charter, rights, and privileges." MR.0207-0208.[6] While the petition also seeks "civil penalties" and attorneys' fees, the petition provides no specific allegations to quantify those penalties.

That the primary intent of this lawsuit is injunctive is buttressed by the Attorney General's public explanations of this matter, such as:

- "Attorney General Ken Paxton secured a major victory . . . by stopping continued unlawful fundraising activity . . . ."[7]

---

[6] To the extent this truly is a "quo warranto lawsuit," Resp. at 28, then it's even clearer that proper venue lies in El Paso County. *See* TEX. CIV. PRAC. & REM. CODE § 66.002(a).

[7] Press Release, Tex. Att'y Gen., *Attorney General Ken Paxton Secures Major Victory Stopping Runaway Democrats from Taking "Beto Bribes" and Preventing Deceptive Fundraising* (Aug. 8, 2025), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-secures-major-victory-stopping-runaway-democrats-taking-beto-bribes-and.

- "Robert Francis flagrantly and knowingly violated the court order I secured that prevents him from raising funds and distributing any more Beto Bribes. . . . It's time to lock him up."[8]

- "Attorney General Ken Paxton has secured the extension of restraining orders against Robert Francis O'Rourke and his organization, [PxP], which prevents the distribution of financial payoffs to Texas Democrats who broke quorum."[9]

In sum, "[t]he injunctive relief sought in this case is not clearly ancillary, incidental, or adjunctive to" the State's vague requests for an unspecified amount of fees and fines. *In re Dole Food Co., Inc.*, 256 S.W.3d at 855.

"[I]t is precisely in divisive, consequential cases when by-the-book fastidiousness by courts is most vital, to blunt even the appearance of evasive corner-cutting or politicized judging." *In re State*, 489 S.W.3d 454, 456 (Tex. 2016) (Willet, J., concurring in judgment). Here, the nation's mid-decade redistricting debate, which started in Texas, could hardly be more consequential—or divisive. Respondent's decision to elevate the DTPA's permissive venue provisions over the

---

[8] Press Release, Tex. Att'y Gen, *Attorney General Ken Paxton Takes Action to Hold Robert Francis O'Rourke in Contempt for Violating Court Order and Scamming Texans* (Aug. 12, 2025), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-takes-action-hold-robert-francis-orourke-contempt-violating-court-order.

[9] Press Release, Tex. Att'y Gen., *Attorney General Ken Paxton Secures Extended TROs Against Beto O'Rourke, Preventing Additional Financial Payoffs to Texas Politicians* (Sept. 4, 2025), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-secures-extended-tros-against-beto-orourke-preventing-additional.

mandatory injunction venue statute (issued via a summary denial, MR.0396, with no explanation) is an abuse of discretion.

## B.     Tarrant County Cannot be Considered a Proper Venue.

Even if the State is correct and venue is not mandatory in El Paso County, Tarrant County cannot be considered a proper permissive venue. As explained above, the State has not credibly pleaded that Relators have "done business" in Tarrant County, or that any relevant "transaction[s] occurred" in Tarrant County, as required by § 17.47(b). *See State of Texas v. Life Partners*, 243 S.W.3d 236, 240-41 (Tex. App.—Waco 2007). The Court may only take the State's allegations as true when "properly pleaded" and only if not "specifically denied by the adverse party." TEX. R. CIV. P. § 87(3)(a). As this Court has already explained, it is not "immediately clear" what "'goods' or 'services' are at issue," much less what, if any, DTPA-regulated conduct took place in Tarrant County. Order at 16; *see also id*. at 22; MR.0034-0035. Further, any bare-boned allegations that exist are specifically rebutted by the affidavit evidence submitted by Relators. MR.0050-0052.[10]

---

[10] The State is wrong that Relators' inadvertent omission of the August 14, 2025 hearing transcript from the initial Mandamus record forecloses the Court's consideration of venue issues. Relators' original Mandamus record (which has now been supplemented) in fact includes "a sufficient record to establish their right to mandamus relief." *Walker v. Packer*, 827 S.W.2d 833, 837 (Tex. 1992).

**IV.    The Trial Court Abused Its Discretion in Failing to Grant Reciprocal Discovery.**

Respondent abused its discretion in failing to grant Relators' *any* reciprocal discovery. Texas law and fundamental fairness dictate that Relators were entitled to discovery prior to the temporary injunction hearing, especially when the trial court allowed the State to obtain substantially similar discovery from Relators on a similar timeline. The trial court's failure to grant the discovery request was an abuse of discretion and not remedial upon appeal.

At the then-set September 2 temporary injunction hearing, the State was required to prove that there was "reason to believe" (a) that the DTPA is being or has been violated; and (b) that a temporary injunction would be in the public interest. *See* TEX. BUS. & COM. CODE § 17.47(a). *All* of Relators' expedited discovery requests went to the heart of the temporary injunction elements. *See* State SR.258-264 (seeking: (1) documents from actual people complaining about allegedly deceptive practices; (2) the political advertisement/solicitations the State claimed violate the DTPA; (3) any communications with third parties outside of the State about the lawsuit before it was filed; (4) documents that support the State's claim that PxP conspired to aid and abet Texas Democrats; (5) documents identifying anything any donor received in exchange for a donation to PxP; (6) documents that support the State's contention that funds were used for "lavish personal expenses"; and (7) documents that show PxP made offers to Democratic house members and

28

reliance on those offers). "[A] denial of discovery going to the heart of a party's case may render the appellate remedy inadequate." *Walker*, 827 S.W.2d at 843-844. Such is the case here where the trial court allowed discovery by the State to proceed prior to the temporary injunction hearing but refused substantially similar, reciprocal, discovery for Relators. The State's counter-arguments are without merit.

Relators' discovery request was not "eleventh-hour." Rather, the motion was filed at the same cadence of other filings in this fast-paced litigation. There is no question that this case proceeded at a breakneck pace at the trial court. But the State would have this Court believe their own requests for discovery were sought on a much longer timeline than Relators. Not so. The series of events related to discovery proceeded as follows:

- **Tuesday, August 12** - The State filed an opposed motion for expedited discovery, including requesting depositions of Relators and a plethora of documents, *to be completed within 7 days,* before the then-set August 19 TRO hearing. MR.0162-0167.

- **Thursday, August 14** - A hearing was held on a number of motions, including the State's motion for expedited discovery. MR.0398-401. Respondent moved the temporary injunction hearing from August 19 to September 2. MR.0391-0395.

- **Monday, August 18** - Respondent granted the State's request for expedited discovery, ordering discovery to conclude within 11 days, on August 29. MR.0398-401.

- **Wednesday, August 20** - Relators filed their emergency motion for reciprocal discovery, asking Respondent to grant the motion outright or, in the alternative, set the motion for hearing. State SR.258-264. The motion was filed one day shy of *two weeks before* the temporary injunction hearing, only

29

two days after Respondent granted the State's discovery motion. Relators requested discovery be completed within 9 days, by August 29. State SR.258-264.

- **Monday, August 25** - A hearing was held on Relators' motion for expedited reciprocal discovery. MR.0975-0986. Respondent denied the motion outright at the conclusion of the hearing. MR.0981.

The discovery sought did not, as the State claims, focus on "potential criminal investigations" or "mental impressions and legal reasoning of the State's attorneys." Resp. at 32-33. Rather, Relators sought documents and a limited deposition, all of which go to the "heart of [Relator's] case." *Walker*, 827 S.W.2d at 843. Of course, the rules related to privileges and work product doctrines still apply and such was acknowledged in Relators' motion. MR.0918.

The one case the State cites for the notion that Relators' requests were improper is *Hobson v. Moore*, 734 S.W.2d 340 (Tex. 1987), which is inapplicable here. In *Hobson*, at the trial court, the plaintiffs brought a lawsuit against law enforcement officers for an investigation they were conducting. The Supreme Court denied mandamus because those officers did not timely object or raise a privilege to civil discovery requests at the trial level. Nothing in the *Hobson* case suggests Relators' discovery requests were improper.

## V. The Trial Court Abused its Discretion in Granting an Anti-Suit TRO.

The State has acted in bad faith on multiple occasions during the short pendency of this litigation. It does so again here, claiming "to date, the Tarrant

County district court has issued substantive rulings on *venue, jurisdiction,* and other matters—only to have the El Paso court enjoin those rulings piece by piece" and alleging "*constant interjection* of the El Paso court into the Tarrant County court's proceedings." Resp. at 47 (emphasis added). To the contrary, when the El Paso Court issued its TRO, the Tarrant County Court had not ruled on proper venue for quo warranto, jurisdiction for a potential quo warranto case, or even granted the State leave to file its quo warranto petition. Relators requested their El Paso TRO **before** the State set a hearing or obtained a ruling granting it leave to file its quo warranto claim in Tarrant County. Indeed, there is still no order granting leave to pursue quo warranto in Tarrant County. For its part, the State participated in two hearings, filed and argued a plea in abatement, and filed an appeal in the El Paso case before seeking an Antisuit TRO. MR.0533-0549, 0706, 0718-0723. The State has simply failed to demonstrate an "irreparable miscarriage of justice." *Golden Rule Ins. Co. v. Harper*, 925 S.W.2d 649, 652 (Tex. 1996); MR.0866-0867. Rather, a mandatory venue statute applies, TEX. CIV. PRAC. & REM. CODE § 15.012, and the state has an adequate remedy by appealing a plea in abatement. *See, e.g.*, *Atkinson v. Arnold*, 893 S.W.2d 294, 298 (Tex. App.—Texarkana 1995, no writ). This Court should grant mandamus as to the Antisuit TRO and deal with any matters related to the El Paso litigation in proper course as part of *that* litigation.

31

# CONCLUSION

For the foregoing reasons, Relators respectfully request this Court grant the Petition.

Respectfully submitted,

/s/ *Mimi Marziani*
**Mimi Marziani**
Texas Bar No. 24091906
**Joaquin Gonzalez**
Texas Bar No. 24109935
**Rebecca (Beth) Stevens**
Texas Bar No. 24065381
**MARZIANI, STEVENS & GONZALEZ PLLC**
500 W. 2nd Street, Suite 1900
Austin, TX 78701
Phone: 210-343-5604
mmarziani@msgpllc.com
jgonzalez@msgpllc.com
bstevens@msgpllc.com

-and-

**Sean J. McCaffity**
State Bar No. 24013122
**SOMMERMAN McCAFFITY, QUESADA & GEISLER L.L.P.**
3811 Turtle Creek Blvd, Ste 1400
Dallas, Texas 75219-4461
Phone: 214-720-0720
smccaffity@textrial.com

**COUNSEL FOR RELATORS**

32

## CERTIFICATE IN ACCORDANCE WITH TEX. R. APP. P. 52.3(J)

By signature below, the undersigned counsel certifies that she has reviewed the response and concluded that competent evidence (included in the appendix or record) supports every factual statement in the response.

*/s/ Mimi Marziani*
Mimi Marziani

## CERTIFICATE OF COMPLIANCE

This document complies with the typeface requirements of Texas Rule of Appellate Procedure 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Rule 9.4(i), if applicable, because it contains 7,477 words, excluding any parts exempted by Rule 9.4(i)(1).

*/s/ Mimi Marziani*
Mimi Marziani

# CERTIFICATE OF SERVICE

Pursuant to the Texas Rule of Appellate Procedure, I certify that a true copy of foregoing has on September 16, 2025 been sent via e-mail to the respondent, and by and through their counsel of record to the real party in interest at the addresses below:

Hon. Megan Fahey
348th Judicial District Court
Tarrant County Courthouse
100 North Calhoun St., 3rd Floor
Fort Worth, TX 76196
Phone: 817-884-2715
ndbentley@tarrantcountytx.gov
LAAdams@tarrantcountytx.gov

Ken Paxton
Attorney General of Texas
Abigail E. Smith
Assistant Attorney General
Rob Farquharson
Dep. Chief, Consumer Protection Division
Johnathan Stone
Chief, Consumer Protection Division
Office of the Attorney General of Texas
Consumer Protection Division
300 W. 15th St.
Austin, Texas 78701
Phone: (214) 290-8811
Fax: (214) 969-7615
Rob.Farquharson@oag.texas.gov
Abby.Smith@oag.texas.gov

*/s/ Mimi Marziani*
Mimi Marziani

34

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Joaquin Gonzalez on behalf of Joaquin Gonzalez
Bar No. 24109935
jgonzalez@msgpllc.com
Envelope ID: 105670280
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: Relator's Reply in Support of Petition for Writ of Mandamus
Status as of 9/17/2025 7:02 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Sean McCaffity | 24013122 | smccaffity@textrial.com | 9/16/2025 7:22:41 PM | SENT |
| Robert Farquharson | 24100550 | rob.farquharson@oag.texas.gov | 9/16/2025 7:22:41 PM | SENT |
| Maria Williamson | | maria.williamson@oag.texas.gov | 9/16/2025 7:22:41 PM | SENT |
| William FCole | | William.Cole@oag.texas.gov | 9/16/2025 7:22:41 PM | SENT |
| Mimi Marziani | | mmarziani@msgpllc.com | 9/16/2025 7:22:41 PM | SENT |
| Joaquin Gonzalez | | jgonzalez@msgpllc.com | 9/16/2025 7:22:41 PM | SENT |
| Pauline Sisson | | pauline.sisson@oag.texas.gov | 9/16/2025 7:22:41 PM | SENT |
| Rebecca Stevens | | bstevens@msgpllc.com | 9/16/2025 7:22:41 PM | SENT |
| Emily Samuels | | emily.samuels@oag.texas.gov | 9/16/2025 7:22:41 PM | SENT |
| Brian Falligant` | | bfalligant@inquestresources.com | 9/16/2025 7:22:41 PM | SENT |
| William Peterson | | william.peterson@oag.texas.gov | 9/16/2025 7:22:41 PM | SENT |
| Rebecca Neumann | | rneumann@textrial.com | 9/16/2025 7:22:41 PM | SENT |
| Nancy Bentley | | ndbentley@tarrantcountytx.gov | 9/16/2025 7:22:41 PM | SENT |
| Lisa Adams | | LAAdams@tarrantcountytx.gov | 9/16/2025 7:22:41 PM | SENT |

Associated Case Party: State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| William Cole | 24124187 | William.Cole@oag.texas.gov | 9/16/2025 7:22:41 PM | SENT |
| Rob Farquharson | | rob.farquharson@oag.texas.gov | 9/16/2025 7:22:41 PM | SENT |
| Johnathan Stone | | johnathan.stone@oag.texas.gov | 9/16/2025 7:22:41 PM | SENT |
| Justin Sassaman | | justin.sassaman@oag.texas.gov | 9/16/2025 7:22:41 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Joaquin Gonzalez on behalf of Joaquin Gonzalez
Bar No. 24109935
jgonzalez@msgpllc.com
Envelope ID: 105670280
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: Relator's Reply in Support of Petition for Writ of Mandamus
Status as of 9/17/2025 7:02 AM CST

Associated Case Party: State of Texas

| Justin Sassaman | | justin.sassaman@oag.texas.gov | 9/16/2025 7:22:41 PM | SENT |
|---|---|---|---|---|
| William Peterson | | William.Peterson@oag.texas.gov | 9/16/2025 7:22:41 PM | SENT |
| Abby Smith | | abby.smith@oag.texas.gov | 9/16/2025 7:22:41 PM | SENT |